# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**NORMAN L. ROELKE**
Fort Wayne, Indiana

ATTORNEY FOR APPELLEES:

**TANDRA M. STOVALL**
Stuart & Branigin LLP
Lafayette, Indiana

FILED
Mar 19 2013, 9:20 am
CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

JUDY CHANG, )
)
 Appellant - Plaintiff, )
)
   vs. )  No. 02A03-1206-PL-272
)
PURDUE UNIVERSITY; THE TRUSTEES OF )
PURDUE UNIVERSITY; DR. FRANCE A. )
CORDOVA, President of Purdue University, (in )
her official capacity); DR. MICHAEL A. )
WARTELL, Chancellor of IPFW, (in his official )
capacity); DR. LINDA FINKE (in her individual )
capacity); DR. LINDA MEYER (in her individual )
capacity); DR. CAROL STERNBERGER, (in her )
individual capacity); and DR. KATHLEEN )
O'CONNELL (in her individual capacity), )
)
 Appellees - Defendants. )

**APPEAL FROM THE ALLEN SUPERIOR COURT**
The Honorable David J. Avery, Judge
Cause No. 02D01-0910-PL-378

**March 19, 2013**

**OPINION - FOR PUBLICATION**

**FRIEDLANDER, Judge**

Judy Chang appeals the denial of her summary judgment motion and her motion for directed verdict, as well as the grant of a summary judgment motion submitted by Purdue University, the Trustees of Purdue University, Dr. France Cordova (in her capacity as Purdue University's president), Dr. Michael Wartell (in his capacity as chancellor of Indiana University – Purdue University at Fort Wayne (IPFW)), and, in their individual capacities, Dr. Linda Finke, Dean of the College of Health and Human Services (CHHS), Dr. Linda Meyer, IPFW's Director of Undergraduate Programs for the Department of Nursing and a professor in that department, Carol Sternberger, Chair of the Department of Nursing, and Kathleen O'Connell, a former professor in the nursing program and IPFW's Associate Vice Chancellor for Academic Affairs. Chang also appeals a jury verdict against her. Chang presents the following restated issues for review:

1.      With respect to Chang's breach-of-contract claims, did the trial court err in not granting Chang's pretrial summary judgment motion, or her motion for a directed verdict at the end of trial; and did the evidence support the jury's verdict?

2.      With respect to Chang's claim under 42 U.S.C. § 1983, did the trial court err in denying Chang's summary judgment motion and granting Purdue's summary judgment motion?

3.      With respect to Chang's claim arising under article 1, section 12 of the Indiana Constitution, did the trial court err in denying Chang's summary judgment motion?

4.      Did the trial court err in dismissing Chang's claims of tortious interference with Chang's contract and property rights?

5.      Did the trial court err in not allowing the testimonies of Chris Mertz regarding his suspension from class for unprofessional conduct and violations of the IPFW Disciplinary Code, and of Grace Decker, who

2

witnessed the October 30, 2008 incident that led to Chang's dismissal from the Department of Nursing, College of Health and Human Services?

We affirm.

In the fall of 2008, Chang was a student enrolled in CHHS's Department of Nursing at Purdue's regional IPFW campus. This case ultimately centers upon her dismissal from the CHHS and the Department of Nursing, a dismissal that was precipitated by an incident involving Chang and primarily one other CHHS student on October 30, 2008. This incident was not Chang's first difficulty in the nursing program.

Chang's studies in IPFW's nursing program began in 2007. On January 29, 2007, Chang's lab coordinator formally documented concerns about Chang's lab skills. When lab personnel attempted to discuss their concerns with Chang, Chang "became very argumentative and stated she felt targeted." *Appellees' Appendix* at 67. When someone in the program again attempted to discuss their concerns with Chang on or about February 7, 2007, this resulted in "angry behavior" on Chang's part. *Id*. When that person was asked about another meeting with Chang, she responded: "I am not comfortable talking to [Chang] alone. As I have thought more about this today, I am concerned that there is more to this than just a difference in cultures. I am wondering about some type of personality disorder or mental problem." *Id*. Finally, on February 16, Dr. Sternberger met with Chang and they discussed a specific plan "for improvement in nursing lab check-offs and clinical." *Id*. at 67-68. Dr. Sternberger sent Chang a follow-up email summarizing the substance of their meeting. Chang responded to this email as follows: "PLEASE LEAVE ME ALONE. I

3

DON'T WANT TO BE BOTHERED LIKE THIS AGAIN." *Id*. at 68.

On April 3, 2007, Chang had a confrontation with another nursing student. A supervisor saw Chang leaning over a table within six inches of another student and "talking very hateful" to that student. *Id*. at 69. Moments later, the supervisor observed the other student crying and saying to Chang, "I don't want to discuss this with you any more." *Id*. The supervisor observed that Chang leaned back over to the student and "was talking hateful again." *Id*. On April 6, Dr. Sternberger advised Chang that a hearing was scheduled concerning the April 3 incident. On April 10, program personnel received an email regarding an incident involving Chang in the office of Services for Students with Disabilities. According to the email, Chang was "argumentative with Mary and Judy in their office, throughout which Chang 'became increasingly agitated and disrespectful.'" *Id*. at 70. On April 18, 2007, Dr. Sternberger filed a report with IPFW campus police reporting that students overheard Chang making statements to the effect, "I have a gun" or "I have a gun and know how to use it." *Id*.

On September 17, 2007, Dr. Sternberger advised Dr. Donna Bialik, IPFW's Dean of Students, that Chang was failing her clinical course at St. Joseph Hospital's Adult Behavioral Health Unit as a result of unprofessional conduct. Chang was advised that a meeting was scheduled for September 19 to discuss Chang's behavior in the course. Chang did not attend the meeting, but instead dropped the course. On December 21, 2007, the Nursing Department notified Chang that she had earned a grade below a "C", and thus on January 8, 2008, Chang was placed on academic probation.

As indicated previously, however, all of the foregoing was prelude to the incident that gave rise to the present litigation. On October 30, 2008, Chang and student Julie Webb argued about "a group project and the tasks to be performed by the students for their nursing class." *Appellant's Appendix* at 25. The argument left Webb feeling threatened by Chang. Webb, who was pregnant at the time, believed that Chang was going to push her down the stairs. On November 4, 2008, Dean Finke and Dr. Sternberger determined that Chang had violated the professional misconduct policy and Meyer informed Chang that she would be removed from the clinical course pending an investigation of the complaint about Chang's conduct. Chang was then escorted out of the hospital by security personnel.

In connection with the October 30 incident, Chang was charged with unprofessional conduct pursuant to the Department of Nursing Professional Misconduct policy, which states:

> Students may be failed in a nursing course and/or dismissed from the IPFW/Parkview Department of Nursing for unprofessional conduct that jeopardizes the health and/or safety of patients/clients and/or others or has a potentially detrimental effect on the Department of Nursing. Due to the serious consequence of certain unprofessional behaviors, procedures for dismissal from the program may be initiated. If the student is in a clinical setting at the time that professional misconduct occurs, the person will be immediately removed from the site. The student will be suspended from all clinical settings pending the outcome of the disciplinary process.
>     Students are held to the standards of the Indiana Nurse Practice Act and as such, they are liable for their own actions. Behaviors of professional misconduct occurring at any time while the person is a student in the nursing program may result in disciplinary action include, but are not limited to:
>
> - Patient Abandonment and/or neglect
> - Commission of fraudulent acts/documentation
> - Breach of confidentiality
> - Theft of property from a clinical agency, client, others of IPFW

- Disorderly conduct
- Verbal abuse that involves an expressed or implied threat to a person's safety
- Physical abuse of any person
- Possession of a weapon
- Failed drug screen and/or possession of drugs or controlled substances
- Failed drug screen and/or possession of alcohol while at a clinical agency
- Failure to report an arrest with felony charges or a felony conviction
- Any behavior that constitutes misconduct as defined by the *IPFW Student Handbook and Planner* and/or the *IPFW Undergraduate Bulletin*.

The Department of Nursing follows the processes outlined in the College of Health and Human Services (CHH) Policy on Professional Misconduct and the IPFW Student Disciplinary Procedures. The CHH Policy on Professional Misconduct may be obtained from the office of the Dean. The IPFW Student Disciplinary Procedures is found in the *IPFW Student Handbook and Planner* and/or the *IPFW Undergraduate Bulletin*.

*Appellee's Appendix* at 64. On November 6, Chang met with a committee of the Department of Nursing to discuss the allegations against her and to allow Chang an opportunity to respond. The committee consisted of Pam DeKonnck and Sanna Harges, members of the nursing faculty, Meyer, Director of Undergraduate Programs, and Sternberger, Chair of the Nursing Department. Chang attended with her advisor, Bialik. The committee first met with Webb, the other student involved in the incident. Webb "voiced extreme concern for her safety", and indicated that she had filed a statement with the Fort Wayne Police Department and stated that she was considering obtaining a restraining order. *Id*. at 27. The student also indicated that although her home telephone number was unlisted, Chang had

called her at home earlier in the semester. Later, Chang had left a "rambling message" on the student's cell phone. *Id.* After the student met with Bialik, Chang was directed to stop calling the student. In a letter sent to Chang informing her of her dismissal from the program, the committee stated:

> The nursing department committee determined that sufficient evidence of a pattern of unprofessional conduct that jeopardized the health and/or safety of classmates was documented to support dismissal from nursing program [sic]. The decision was based on the pattern of action of verbal abuse that involved an expressed or implied threat to a person's safety.

*Id.*

On November 23, 2008, Chang appealed her dismissal to the Student Appeals Committee. In addition to reviewing a packet containing all that had occurred up to that point, the Student Appeals Committee met with the faculty members involved in Chang's case, and also met with Chang in order to allow her to tell her side of the story. On December 8, 2013, the Student Appeals Committee informed Chang by letter that the committee had reviewed Chang's appeal of the decision and "unanimously believes the decision made by the Department of Nursing was justified." *Id.* at 91.

On December 29, 2008, Chang appealed the Student Appeals Committee's decision to the Campus Appeals Board. This board consisted of Dr. O'Connell, faculty members Douglas Townsend and Margit Codispoti, S.S., a business student, and A.K., a psychology student. Chang initiated the appeal to the Campus Appeals Board by submitting a letter to the IPFW office of the Dean of Students, in which she cited the following grounds for appeal:

7

> I beleive [sic] improper Procedures and a lack of Due Process have been followed at the earlier steps of the appeal process in that I was not given the names of the witnesses against me, their statements and/or allowed to confront them in the appeals process or confront false evidence provided and cited by Dr. Carol Sternberger to support dismissal from the College of Health and Human Services. It is also believed the department tried to coerce an impartial witness to testify against me and yet her statement stated that she did not see any expressed or implied threat.
>
> I believe I have been discriminated upon [sic] based on my race, sex, and/or national origin.

*Id*. at 25. The Campus Appeals Board held a hearing on March 30, 2009. Chang was present at the hearing and Norman Roelke, Chang's appellate counsel in the present litigation, served as her advisor. The Campus Appeals Board heard statements and reviewed evidence submitted by both sides, and also received the testimony of Meyer, Finke, and Sternberger as witnesses for the Department of Nursing and CHHS. The board ultimately affirmed Chang's dismissal on the strength of the following conclusions:

> Testimony and documentation appear to identify that [Chang] was treated fairly, received notification, engaged in a discussion of the charges with the nursing faculty, and was informed of the results and her right of appeal. No documentation was found to identify whether or not Ms. Chang was informed that she would possibly be dismissed from the program as a result of the meeting. However, a review of documentation of concerns about the student's behavior in the clinical setting dating back to her first clinical course revealed that the faculty had, or had attempted to, talk with, meet with, or communicate with Ms. Chang on a number of occasions to inform her that she needed to present herself in a more positive and cooperative professional manner when dealing with patients, staff and classmates. The consequences for unprofessional behavior are identified in the Professional Misconduct Policy in the Nursing Student Manual and the behaviors covered by the policy do not appear to be limited to the clinical setting. The removal from the clinical setting by the dean of the college and security staff was also a significant event. The majority of the Board therefore concluded that the student should have known that her place in the nursing program was in jeopardy when she

8

attended the meeting.

*Id*. at 95.

Finally, Chang appealed to IPFW Chancellor Wartell, who affirmed the Campus Appeals Board's ruling. In an April 15, 2009 letter to Chang, Chancellor Wartell explained:

> Based upon the facts and circumstances in this matter, I concur with the Recommendations and determine there was no violation of due process when you were dismissed from the Department of Nursing and the College of Health and Human Services. Specifically, I find you were notified of the allegations causing your removal from the clinical setting. Further, you were notified of the meeting and were offered an opportunity to rebut information as well as present information in your favor. Still further, documentation was provided that you were previously informed of your prior unprofessional behavior. Still further, the *Professional Misconduct Policy*, in the Nursing Student Handbook, states dismissal may occur for unprofessional conduct and "behaviors of professional misconduct occurring at any time while the person is a student in the nursing program may result in disciplinary action…[.]" Still further, the College of Health and Human Services chooses the most stringent course of action regarding misconduct and a "student dismissed from his or her program will also be dismissed from the College of Health and Human Services." Still further, the Student Appeals Committee found your dismissal to be proper. When considering these factors, you were afforded due process in your dismissal from both the Department of Nursing and the College of Health and Human Services.

*Id.* at 60-61.

On October 6, 2009, Chang filed the present lawsuit. In Count I, Chang alleged a violation of her Fourteenth Amendment due process rights under 42 U.S.C. § 1983. Specifically, she sought injunctive relief against the Trustees, Cordova, and Wartell in the form of reinstatement in the nursing program and expungement from her student files and records of all references to the above-described events, including the "F" she received in the class she was talking at the time of her dismissal. She also sought under Count I

9

compensatory damages against Finke, Meyer, Sternberger, and O'Connell, in their individual capacities. She sought essentially the same relief under Count II, which alleged that Appellees violated her rights under article 1, section 12 of the Indiana Constitution, Indiana's version of the guarantee of due process. Under Count III, Chang alleged that Appellees' acts constituted a breach of the implied contract between Purdue University and Chang with respect to Article 16 of the Purdue Conduct Code.[1] Under this count, Chang sought injunctive relief against Cordova and Wartell, and compensatory and punitive damages against the Trustees, Finke, Meyer, Sternberger, and O'Connell. Under Count IV, Chang alleged a second claim of breach of contract, this one related to the IPFW Code. As with her claim for relief under Count III, Chang also sought injunctive relief against Cordova and Wartell, and compensatory and punitive damages against the Trustees, Finke, Meyer, Sternberger, and O'Connell. Under Count V, Chang alleged that Appellees tortiously interfered with her property right in obtaining a nursing education at Purdue University and thereby sought compensatory and punitive damages from Finke, Meyer, Sternberger, and O'Connell in their individual capacities. Finally, under Count VI, Chang sought compensatory and punitive damages from Finke, Meyer, Sternberger, and O'Connell in their individual capacities under a theory of tortious interference with contract pertaining to Chang's contract with Purdue University.

---

[1] Article 16 states, in pertinent part: "Every student … has the right to substantial and procedural fair play in the administration of discipline and the imposition of academic sanctions. This requires in all situations that the student be given an opportunity to refute them, and that the institution not be arbitrary in its actions." *Appellant's Appendix* at 32.

10

On March 29, 2010, the trial court granted Purdue University's motion to dismiss Count I, but denied all of Appellees' other motions to dismiss Count I with respect to the remaining defendants, and also denied all other motions to dismiss Counts II, V, and VI. On October 5, 2011, Chang filed a motion for summary judgment. Appellees countered with a summary judgment motion of their own on October 7, 2011. On March 21, 2012, the trial court granted summary judgment in favor of Appellees "on that portion of Count I … seeking monetary damages and equitable relief from [Appellees] pursuant to § 1983." *Appellant's Appendix* at 45. The court granted Appellees' summary judgment motion with respect to Chang's claims for monetary damages under Count II, but denied summary judgment on the request for injunctive relief. The court determined that neither side was entitled to summary judgment concerning Counts III and IV. The court granted summary judgment in favor of Appellees with respect to Counts V and VI on grounds that Chang failed to comply with the notice provision of the Indiana Tort Claims Act. *See* Ind. Code Ann. § 34-13-3-8 (West, Westlaw current through 2012 2nd Reg. Sess.).

Essentially, only Counts III and IV survived the pretrial phase and proceeded to jury trial. By that time, Purdue University was the only remaining defendant. The trial court decided to conduct a bifurcated trial, with the first phase addressing liability and the second phase focusing on damages. In the first phase, the court determined that the following two issues would be submitted to the jury:

1.  The nature and terms of the contractual agreement between [Chang] and the Defendant, Purdue University.

11

2. Whether the Defendant, Purdue University, breached its contract with [Chang] by failing to follow proper procedures in dismissing [Chang] from the Nursing Program.

*Appellant's Appendix* at 18. The jury found in favor of Purdue University and against Chang on Counts III and IV, and the trial court entered judgment accordingly.

1.

Chang contends the trial court erred in not granting her pretrial summary judgment motion and her motion for a directed verdict at the end of trial concerning her breach-of-contract claims. She also contends the evidence did not support the jury's determination that Purdue University did not breach its contract with Chang.

Our standard of review for rulings on summary judgment motions is well settled.

When reviewing a grant or denial of a motion for summary judgment our standard of review is the same as it is for the trial court. The moving party "bears the initial burden of making a prima facie showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law." *Gill v. Evansville Sheet Metal Works, Inc.,* 970 N.E.2d 633, 637 (Ind. 2012). Summary judgment is improper if the movant fails to carry its burden, but if it succeeds, then the nonmoving party must come forward with evidence establishing the existence of a genuine issue of material fact. *Id.* In determining whether summary judgment is proper, the reviewing court considers only the evidentiary matter the parties have specifically designated to the trial court. *See* Ind. Trial R. 56(C), (H). We construe all factual inferences in the non-moving party's favor and resolve all doubts as to the existence of a material issue against the moving party. The fact that the parties have filed cross-motions for summary judgment does not alter our standard for review, as we consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law.

*Reed v. Reid*, 980 N.E.2d 277, 285 (Ind. 2012) (some internal citations to authority omitted).

"We will affirm the denial of summary judgment if it is sustainable on any legal theory or

basis found in the evidentiary matter designated to the trial court." *Illinois Bulk Carrier, Inc. v. Jackson*, 908 N.E.2d 248, 253 (Ind. Ct. App. 2009) (quoting *W. Amer. Ins. Co. v. Cates,* 865 N.E.2d 1016, 1020 (Ind. Ct. App. 2007), *trans. denied*), *trans. denied*.

Chang's breach-of-contract claims center upon the applicability of the Purdue Code and IPFW Code to Chang's dismissal. In a nutshell, Chang contended below and reiterates upon appeal that those two codes govern – or *should* govern – proceedings that, as happened in her case, result in dismissal. Those codes prescribe a panoply of rights and procedures, some of which were not followed in Chang's dismissal from the nursing program. Ultimately, the trial court concluded that neither party was entitled to summary judgment on this question and that the question should be submitted to the jury.

We begin our discussion of this issue by reviewing a matter that is foundational to Chang's claim in this regard, i.e., the nature of the contractual relationship between a university and its students. We recently had cause to explore this subject in depth in *Amaya v. Brater*, 981 N.E.2d 1235 (Ind. Ct. App. 2013). We understand that the *Amaya* opinion has not yet been certified and that a petition for rehearing in that case is pending. We discuss this case, however, because we agree with its analysis and rationale, which are instructive and apply with equal force in the present case. In *Amaya*, a medical student, Amaya, was dismissed from medical school after three professors reported having observed him cheating during a test. A disciplinary complaint was filed and a hearing was held on that complaint. At the conclusion of the proceedings, the student was dismissed. Thereafter, he initiated appeals that ultimately proved to be unsuccessful and the dismissal was upheld. He filed a

13

lawsuit against the medical school seeking reinstatement. One of the theories of liability advanced in his complaint was that the medical school had breached its contract with him by not publishing its standards and procedures for disciplinary actions in accordance with accreditation standards and the Indiana University Code of Student Ethics. He also complained that the medical school breached its contract by not strictly adhering to "its own internal policies and procedures for disciplinary misconduct and to 'guarantee students in the unit a fair opportunity to be heard consistent with the standards of evidence and due process found' in the Code of Student Ethics and the LCME's accreditation standards." *Id*. at 1240-41.

Although courts have analyzed the relationship between student and university under many different legal doctrines, "'[t]he most pervasive and enduring theory is that the relationship between a student and an educational institution is contractual in nature. The terms of the contract, however, are rarely delineated, nor do the courts apply contract law rigidly.'" *Id.* at 1240 (quoting *Neel v. Ind. Univ. Bd. Of Trs.*, 435 N.E.2d 607, 610 (Ind. Ct. App. 1982)). Although it is generally accepted that a university's catalogues, bulletins, circulars, and regulations that are made available to its students become of part of this contract, our courts have taken "a very flexible approach to the scope of contractual promises between students and universities and have noted that hornbook rules cannot be 'applied mechanically where the principal is an educational institution' and the result would be to override an academic determination." *Id.* (quoting *Neel v. Ind. Univ. Bd. Of Trs.,* 435 N.E.2d. at 611) (citations omitted).

14

University disciplinary determinations in most cases are premised upon the subjective professional judgment of trained educators, and therefore our courts "'have quite properly exercised the utmost restraint in applying traditional legal rules to disputes within the academic community.'" *Id.* (quoting *Neel v. Ind. Univ. Bd. Of Trs.*, 435 N.E.2d at 611). As a result, in the area of academic services, our approach has been akin to the one used in the case of contracts conditioned upon the satisfaction of one party. The university requires that a student's academic performance be satisfactory in the university's honest judgment. "'Absent a showing of bad faith on the part of the university or a professor, the court will not interfere. The good faith judgment model both maximizes academic freedom and provides an acceptable approximation of the educational expectations of the parties.'" *Id.* (quoting *Neel v. Ind. Univ. Bd. Of Trs.*, 435 N.E.2d at 611). Bad faith in this context "'is not simply bad judgment or negligence [, r]ather, it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity.'" *Id.* (quoting *Gordon v. Purdue Univ.,* 862 N.E.2d 1244, 1251 (Ind. Ct. App. 2007)). "*Literal adherence by a university to its internal rules will not be required when the dismissal of a student 'rests upon expert judgments as to academic or professional standards and such judgments are fairly and nonarbitrarily arrived at.'" Id.* (quoting *Neel v. Ind. Univ. Bd. Of Trs.,* 435 N.E.2d at 612) (emphasis supplied).[2] Our sole

---

[2] We note that the trial court determined in its March 21, 2012 ruling that Appellees were not entitled to summary judgment on Chang's breach-of-contract claim on grounds that Chang was required to prove bad faith in order to prevail on this theory of liability in the present context, and failed to do so. In reaching this conclusion, the court expressly rejected the argument that this court's decision in *Gordon v. Purdue Univ.*, 862 N.E.2d 1244, established that bad faith is an element of a breach-of-contract claim by a student against a post-secondary institution that is premised upon a failure to adhere to university regulations pertaining to student disciplinary proceedings. The court noted that *Gordon* involved a dismissal for academic misconduct, whereas the present case involved a dismissal premised upon professional misconduct. In the trial court's view, this

15

function when reviewing disciplinary actions such as in the present case is to determine whether the educational institution acted illegally, arbitrarily, capriciously, or in bad faith. *Amaya v. Brater*, 981 N.E.2d 1235.

As set out in detail above, Chang was given notice that the Nursing Department Committee would convene a hearing on November 6, 2008 at which Chang would be given a chance to present her side of the story concerning allegations that Chang had engaged in professional misconduct during the October 30 incident. Chang relayed to the committee her version of what had happened, after which the committee concluded that the evidence revealed Chang had engaged in a pattern of unprofessional conduct that jeopardized the health and/or safety of a classmate. Chang appealed her dismissal to the Student Appeals Committee, which reviewed the evidence presented to the Nursing Department Committee and listened to Chang's version of the incident. The Student Appeals Committee upheld the dismissal. Chang next appealed to the Campus Appeals Board. Chang provided a written submission to and appeared personally before the CAB and made a statement outlining her position. The CAB reviewed evidence presented by both sides. After the hearing was concluded, the CAB determined that Chang had been provided a meaningful opportunity to defend the charge against her and thus had received due process, and that the evidence supported Chang's dismissal. The CAB also determined that the Nursing Department had

was a significant distinction and provided just grounds for rejecting *Gordon* as applicable in this case. Of course, the trial court did not have the benefit of the *Amaya* decision when it made its ruling. We are convinced that the expansive language in *Amaya*, and especially the language highlighted above, indicates that this distinction does not drive a different result than that reached in *Gordon* and in the present case.

acted properly in applying its professional misconduct policy rather than the Purdue Code or the IPFW Code. Finally, Chancellor Wartell reviewed the CAB's findings and recommendations and accepted its recommendation to uphold Chang's dismissal.

Based upon the foregoing, we conclude that Chang failed to designate evidence establishing that the Nursing Department's decision to dismiss Chang was arbitrary, capricious, or made in bad faith. The Nursing Department's conclusion that Chang violated the its professional misconduct policy was a rational determination arrived at after much deliberation and after Chang had several opportunities before multiple different committees and boards to be heard and to explain her behavior.

Finally, we note, as did the *Amaya* panel with respect to the decision-makers in that case, that our deference to the foregoing expert judgments concerning Chang's failure to meet professional standards is dictated by the fact that the administrators and professors in the CHHS and the Nursing Department at IPFW "have a duty to the public as well as to the student." *Amaya v. Brater*, 981 N.E.2d at 1242. "To place incompetent, irresponsible, or unethical [nurses] into active practice would surely be to the detriment of the health and safety of the members of society." *Id*. We reiterate that we are ill-equipped to second-guess professional judgments that are not arrived at arbitrarily. *See Amaya v. Brater*, 981 N.E.2d 1235. The trial court did not err in denying Chang's summary judgment motion.

Chang contends the trial court erred in denying her motion for directed verdict and that the evidence was not sufficient to support the jury's verdict. Because these claims essentially allege the same error, we will combine them into a single discussion of the

17

sufficiency of the evidence. *See, cf., Delagrange v. State*, 981 N.E.2d 1227, 1230 (Ind. Ct. App. 2013) ("'[i]f the evidence is sufficient to sustain a conviction upon appeal, then a motion for a directed verdict is properly denied;" for this reason, "our standard of review is essentially the same as that upon a challenge to the sufficiency of the evidence; thus, our standard of review is essentially the same as that upon a challenge to the sufficiency of the evidence'"), *trans. denied*.

The jury concluded that IPFW did not breach its contract with Chang concerning the procedures for addressing acts on the part of nursing students that are alleged to violate the professional misconduct policy. We summarized and discussed the relevant evidence at length in reaching our conclusion that the trial court did not err in denying Chang's summary judgment motion. We now observe that the same evidence not only supported the trial court's pretrial ruling, but also supports the jury's verdict on that same question. Thus, we need not rehash it. The trial court did not err in denying Chang's motion for directed verdict, because the evidence was sufficient to support the jury's verdicts against Chang.

2.

In Count I of her complaint, Chang sought injunctive relief under 42 U.S.C. § 1983 against the Trustees, Cordova, and Wartell (seeking expungement of the "F" grade in Nursing 202, reinstatement in the nursing program, and the removal from her permanent record of negative comments and police reports filed against her), and compensatory damages against Fink, Meyer, Sternberger, and O'Connell on grounds that they acted outside the scope of their employment in disregarding the Purdue and IPFW Codes when dismissing

18

Chang. She contends that the trial court erred in not granting her summary judgment motion and in granting Purdue's summary judgment motion.

42 U.S.C. § 1983 was designed to prevent states from violating the Constitution and certain federal statutes, and to compensate injured plaintiffs for deprivations of those federally conferred rights. *Culver-Union Twp. Ambulance Serv. v. Steindler*, 629 N.E.2d 1231 (Ind. 1994). "It was not intended to supplant state tort law by providing a remedy for every wrong." *Id.* at 1233. Moreover, our courts have "previously rejected reasoning that 'would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States.'" *Id.* (quoting *Davis v. Williams*, 474 U.S. 327, 332 (1986)). "A state tort does not become a constitutional violation simply because it is committed by a government actor." *Id.* That said, it is well settled that a state official may be sued in his or her official capacity for prospective relief such as an injunction for a violation of a person's due process rights under § 1983. *See*, *e.g.*, *Ross v. Ind. State Bd. Of Nursing*, 790 N.E.2d 110 (Ind. Ct. App. 2003). Chang sued the Trustees, Cordova, and Wartell in their official capacities for just such relief, including reinstatement to the nursing program and expungement from Chang's record of information related to this incident. Also, a state official may be sued in his or her individual capacity for retrospective relief under § 1983.[3] *See*, *e.g.*, *City of Warsaw v. Orban*, 884 N.E.2d 262 (Ind. Ct. App.

---

[3] Appellees contend that the claims against Fink, Meyer, Sternberger, and O'Connell in their individual capacities were "in reality a claim against the State rather than the individual" because "Chang has not alleged a single claim against [them] for conduct taken as a natural person, separate and distinct from their roles as professor and/or administrator at IPFW." *Brief of Appellees* at 15. Thus, they argue, the claims against these

19

2003), *trans. denied.* Chang sued Fink, Meyer, Sternberger, and O'Connell for compensatory damages under § 1983 on grounds that they acted outside the scope of their employment in disregarding the Purdue and IPFW Codes when dismissing Chang.

The trial court granted summary judgment in favor of the Trustees, Cordova, and Wartell in their official capacities, and in favor of Fink, Meyer, Sternberger, and O'Connell in their individual capacities, and correctly so. Assuming that "Chang had federally protected property rights in her continued education in the nursing department", *Appellant's Brief* at 31, "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post-deprivation remedy for the loss is available." *Hudson v. Palmer,* 468 U.S. 517, 533 (1984).

In the present case, as the trial court observed, in Counts III and IV of her amended

---

four persons ostensibly in their individual capacities were actually claims against them in their official capacity, and should be analyzed accordingly. The United States Supreme Court has rejected this line of reasoning:

> [This] theory would absolutely immunize state officials from personal liability for acts within their authority and necessary to fulfilling governmental responsibilities. Yet our cases do not extend absolute immunity to all officers who engage in necessary official acts. Rather, immunity from suit under § 1983 is "predicated upon a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it," *Imbler v. Pachtman,* 424 U.S. 409, 421, 96 S.Ct. 984, 990, 47 L.Ed.2d 128 (1976), and officials seeking absolute immunity must show that such immunity is justified for the governmental function at issue, *Burns v. Reed,* 500 U.S. 478, 486-487, 111 S.Ct. 1934, 1934, 114 L.Ed.2d 547 (1991).

*Hafer v. Melo*, 502 U.S. 21, 28-29 (1991). Thus, the Court has held that such absolute immunity has been extended only to a "very limited" class "'whose special functions or constitutional status requires complete protection from suit.'" *Id*. at 29 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 807 (1982)). This class includes the President of the United States, legislators carrying out their legislative functions, and judges carrying out their judicial functions. Obviously, none of the Appellees fit in this category.

complaint, Chang alleged breach of contract, seeking damages and equitable relief from the aforementioned parties. She had a meaningful post-deprivation remedy and therefore was not entitled to pursue a claim under § 1983 and the trial court did not err in granting summary judgment in favor of Appellees on that count. *See Hudson v. Palmer,* 468 U.S. 517.

3.

Chang contends that the actions described in our discussion of Issue 2 above also constituted a violation of her due-process rights under article 1, section 12 of the Indiana Constitution. Specifically, under Count II of her amended complaint, Chang alleged that her dismissal from the nursing department violates section 12's guarantee that "[a]ll courts shall be open; and every person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law." Pursuant to this claim, Chang sought monetary damages from Sternberger, Finke, Meyer, and Connell and injunctive relief with respect to Purdue, the Trustees, Cordova, and Wartell. Chang contends that the trial court erred in refusing to grant her motion for summary judgment with respect these claims.

Chang's argument with respect to article 1, section 12 consists almost entirely of cases discussing the federal Due Process Clause. We say "almost" because Chang cites this court's opinion in *Lake Ctr. Sch. Corp. v. Scartozzi*, 759 N.E.2d 1185 (Ind. Ct. App. 2001) for the proposition "that the 14[th] Amendment to the U.S. Constitution has been construed by the courts as analogous to the federal due process clause." *Appellant's Brief* at 33. We assume that Chang meant that article 1, section 12 has been so construed. Although there is language in *Scartozzi* to that effect, our Supreme Court has determined that this is not the case.

21

In *Sanchez v. State*, 749 N.E.2d 509, 515 (Ind. 2001), the Court clarified that "the state constitutional right in Article I, Section 12 and federal due process are not necessarily identical." Undoubtedly, it is primarily for this reason that "[q]uestions arising under the Indiana Constitution" are to be resolved "by examining the language of the text in the context of the history surrounding its drafting and ratification, the purpose and structure of our constitution, and case law interpreting the specific provisions." *Indiana Gaming Comm'n v. Moseley,* 643 N.E.2d 296, 298 (Ind. 1994). "Where a party, though citing Indiana constitutional authority, presents no separate argument specifically treating and analyzing a claim under the Indiana Constitution distinct from its federal counterpart, we resolve the party's claim 'on the basis of federal constitutional doctrine[.]'" *Myers v. State*, 839 N.E.2d 1154, 1158 (Ind. 2005) (quoting *Williams v. State,* 690 N.E.2d 162, 167 (Ind. 1997)), *cert. denied*, 547 U.S. 1148 (2006). We have already rejected Chang's claims under the federal Due Process Clause in Issue 2, and need not repeat that analysis here. Chang's claim under article 1, section 12 fails.

4.

Chang contends the trial court erred in dismissing her claims of tortious interference with Chang's contract and property rights under Counts V and VI. Under Count V, Chang alleged that Finke, Meyer, Sternberger, and O'Connell committed tortious interference of her property rights. Under Count VI, Chang alleged that Finke, Meyer, Sternberger, and O'Connell committed tortious interference with her contractual rights. The trial court granted summary judgment against Chang on grounds that she had failed to comply with the

22

notice provisions of the Indiana Tort Claims Act (ITCA).

The ITCA governs lawsuits against political subdivisions and their employees.[4] *Irwin Mortg. Corp. v. Marion Cnty. Treasurer*, 816 N.E.2d 439 (Ind. Ct. App. 2004). The ITCA provides that a claim against a political subdivision is barred unless notice is filed with (1) the governing body of the political subdivision and (2) the Indiana Political Subdivision Risk Management Commission, within 180 days after a loss occurs. I.C. § 34-13-3-8. For purposes of the ITCA, a state college or university is a political subdivision. Ind. Code Ann. § 34-6-2-110(7) (West, Westlaw current through 2012 2nd Reg. Sess.). Where a plaintiff elects to sue a governmental employee in his or her individual capacity, "notice is required only if the act or omission causing the plaintiff's loss is within the scope of the defendant's employment." *Bienz v. Bloom*, 674 N.E.2d 998, 1004 (Ind. Ct. App. 1996). The ITCA provides substantial immunity for conduct within the scope of a public employee's employment "to ensure that public employees can exercise the independent judgment necessary to carry out their duties without threat of harassment by litigation or threats of litigation over decisions made within the scope of their employment." *Irwin Mortg. Corp. v. Marion Cnty. Treasurer*, 816 N.E.2d at 445. Compliance with the ITCA is a question of law for the court to decide. *Irwin Mortg. Corp. v. Marion Cnty. Treasurer*, 816 N.E.2d 439.

As a preliminary matter, we think it clear that the conduct of which Chang complains was within the scope of Fink's, Meyer's, Sternberger's, and O'Connell's employment. "[I]n

---

[4] In *Poole v. Clase*, 476 N.E.2d 828 (Ind. 1985), our Supreme Court determined that the ITCA applies not only to political subdivisions, but to employees of political subdivisions as well.

order for an employee's act to fall 'within the scope of employment,' the injurious act must be incidental to the conduct authorized or it must, to an appreciable extent, further the employer's business." *Barnett v. Clark*, 889 N.E.2d 281, 283 (Ind. 2008) (quoting *Celebration Fireworks, Inc. v. Smith,* 727 N.E.2d 450, 453 (Ind. 2000)). All of the allegedly injurious actions upon which Chang's tort claims against the individual defendants were based were performed squarely within the context of their roles as professors and administrators at IPFW. To review, Chang sued Finke, the Dean of IPFW's CHHS, Meyer, professor and Director of Undergraduate Programs for the Department of Nursing, Sternberger, Chair of the Department of Nursing, and O'Connell, a former professor in the Department of Nursing and IPFW's Associate Chancellor for Academic Affairs, for their actions, described in detail above, in Chang's dismissal and subsequent efforts to appeal that dismissal. She alleged that they disregarded her testimony and other evidence in pursuing and affirming her dismissal, and that such wrongfully infringed upon her property right to obtain an education at IPFW. It is difficult to imagine a clearer example of action undertaken in an educator's official capacity. Thus, Chang was required to comply with the notice requirements of the ITCA in prosecuting her claims against Fink, Meyer, Sternberger, and O'Connell under Counts V and VI.

The individual appellees filed for summary judgment on these counts on the basis that Chang failed to serve them with the requisite notice under the ITCA. There seems to be no disagreement as to whether Chang sent formal notice of her claims against IPFW; she did not. She contends, however, that she substantially complied with the notice requirements of

24

the ITCA.

> I.C. § 34-13-3-10 (West, Westlaw current through 2012 2nd Reg. Sess.) provides:
>
> The notice required by sections 6, 8, and 9 of this chapter must describe in a short and plain statement the facts on which the claim is based. The statement must include the circumstances which brought about the loss, the extent of the loss, the time and place the loss occurred, the names of all persons involved if known, the amount of the damages sought, and the residence of the person making the claim at the time of the loss and at the time of filing the notice.

"In general, the cause of action of a tort claim accrues and the statute of limitations begins to run when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained as a result of the tortious act of another." *Filip v. Block,* 879 N.E.2d 1076, 1082 (Ind. 2008) (quotation omitted). "[N]otice is sufficient if it substantially complies with the content requirements of the statute." *Collier v. Prater,* 544 N.E.2d 497, 499 (Ind. 1989). In determining whether substantial compliance is established, we look to the purpose of the notice requirements, which is "to inform state officials with reasonable certainty of the accident or incident and surrounding circumstances and to advise of the injured party's intent to assert a tort claim so that the state may investigate, determine its possible liability, and prepare a defense to the claim." *Irwin Mortg. Corp. v. Marion Cnty. Treasurer*, 816 N.E.2d at 446 (quoting *Garnelis v. Ind. State Dep't of Health,* 806 N.E.2d 365, 368 (Ind. Ct. App. 2004)). The claimant bears the burden of establishing substantial compliance. *Irwin Mortg. Corp. v. Marion Cnty. Treasurer*, 816 N.E.2d 439 (Ind. Ct. App. 2004). Substantial compliance with the notice requirement of the ITCA is a question of law. *Rudnick v. N. Ind. Commuter Transp. Dist.*, 892 N.E.2d 204 (Ind. Ct. App. 2008), *trans.*

*denied*.

Chang contends that she substantially complied with the notice requirement because: (1) on March 24, 2009, she sent a letter to Chancellor Wartell claiming that IPFW had violated Chang's due process rights, as described above, and that Wartell should recuse from participation in the review of Chang's dismissal; (2) on April 24, 2009, Chang sent a letter to Cordova, President of Purdue University, informing her that Chang's due process rights had been violated and "asking several questions" of her, *Appellant's Brief* at 36; and (3) "after no action on behalf of Purdue, a demand letter was sent on June 25, 2009 to Purdue as requested by Purdue." *Id*. at 37.

We can readily dismiss the claim that the March 24 and April 24 letters satisfied the ITCA's notice requirement. The purpose of the letter to Wartell was expressly identified in the body of the letter as follows: "The purpose of this letter is to offer IPFW a chance to resolve this matter before this matter moves on to the next public phase of the due process appeal process." *Appellant's Brief* at 65. The remainder of the letter confirms that the subject of the letter was confined to the then-ongoing appeal of Chang's dismissal via the university appeals process. The letter to Cardova was a lengthy missive that was, in substance, part interrogatories[5] and part critique of the University's actions in conjunction with Chang's dismissal from the nursing program and the subsequent appeal process. Both

---

[5] Attorney Roelke posed four questions to Cordova. The fourth question is illustrative of the tenor of the other three: "My fourth question to you, Dr. Cordova, is what is the University's policy concerning police reports, especially those investigated by the campus police department where there is no finding of credible evidence which are placed in the student's file by the complainant and the Chair of the Nursing Department?" *Appellant's Appendix* at 70.

letters functioned almost entirely to advocate Chang's positions with respect to the appeal process at IPFW and certainly did not communicate an intent to file a tort claim.

We now turn our attention to the demand letter. It is true that the letter advised Appellees' counsel that Chang had authorized her counsel to file a lawsuit on her behalf, and also set forth a list of Chang's demands. In fact, that is *all* it contained, and this is not enough. The statutory standard form and content of the notice required by the ITCA are set out in I.C. § 34–13–3–10, which provides that the notice

> must include the following information in a short and plain statement: (1) [T]he circumstances that brought about the loss, (2) the extent of the loss, (3) the time and place the loss occurred, (4) the names of all persons involved if known, (5) the amount of damages sought, and (6) the residence of the person making the claim at the time of the loss and at the time of filing the notice.

*Fowler v. Brewer*, 773 N.E.2d 858, 864 (Ind. Ct. App. 2002), *trans. denied*. The demand letter did not include any information relative to items (1), (3), (4), and (6). We understand that Chang might well respond that Appellees were by then familiar with the situation and already knew all of that information. We have held, however, "that independently acquired knowledge or routine investigation of an occurrence was insufficient to show substantial compliance with the notice statute." *Id*. (finding no substantial compliance where plaintiff's attorney sent a letter to the defendant's insurer informing it only of the fact of representation and that the claim was for damages incurred on the date of the relevant accident). Moreover, I.C. § 34-13-3-10 requires that the requisite notice be hand-delivered or sent by certified or registered mail. There is no indication of how this letter was delivered to Appellees' attorney. *See Fowler v. Brewer*, 773 N.E.2d 858.

27

Finally, we note that I.C. § 34-13-3-8 provides that notice must be delivered not only to the governmental entity in question, but also to the Indiana Political Subdivision Risk Management Commission.[6] Again, we find no indication in the materials before us that this was accomplished. More problematically, there is no indication that Chang even attempted to comply with the ITCA's notice requirement statute. To the extent that her written communications with various entities and individuals associated with Appellees conveyed the required information, it apparently was done without regard to the ITCA. In fact, we can find no indication that Chang even contemplated the ITCA's notice requirement until Appellees challenged some of her claims for relief on that basis. "While this court has interpreted the notice statutes to allow substantial compliance when a claimant has taken affirmative steps to notify the governmental entity, *we cannot find substantial compliance when the claimant took no steps whatsoever to comply with the notice statute[.]*" *Brown v. Alexander*, 876 N.E.2d 376, 383 (Ind. Ct. App. 2007) (emphasis supplied), *trans. denied*.

We stress that this is not a case where a claimant sought to comply with the ITCA's notice requirement provisions, but fell short. The present case involves more than a mere technical shortcoming. It appears instead that Chang did not consider the ITCA, and particularly its requirements governing notice. The trial court did not err in granting summary judgment in favor of Fink, Meyer, Sternberger, and O'Connell on Counts V and VI.

---

[6] The Indiana Political Subdivision Risk Management Commission was "created as a separate body corporate and politic, constituting an instrumentality of the state for the public purposes set out in this chapter, but not a state agency." Ind. Code Ann. § 27-1-29-5 (West, Westlaw current through 2012 2nd Reg. Sess.). Its purpose "is aiding political subdivisions in protecting themselves against liabilities." *Id*.

5.

The trial court granted Appellees' pretrial motion in limine, which sought exclusion of, among other things, "[u]nrelated complaints, charges or lawsuits initiated by other IPFW students or employees." *Appellant's Appendix* at 61. Pursuant to this ruling, the trial court did not permit Chang to call witnesses Chris Mertz, who was suspended from class at IPFW for unprofessional conduct and violations of the IPFW Disciplinary Code, and Grace Decker, who witnessed the October 30, 2008 incident that led to Chang's dismissal from the Department of Nursing, College of Health and Human Services. Chang contends the trial court erred in excluding these witnesses.

Trial courts enjoy broad discretion in ruling on the admissibility of evidence. *W.S.K. v. M.H.S.B.,* 922 N.E.2d 671 (Ind. Ct. App. 2010). We review such rulings for an abuse of discretion and the trial court's decisions in this respect are afforded great deference on appeal. *Whiteside v. State,* 853 N.E.2d 1021 (Ind. Ct. App. 2006). An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Id.* In reviewing the admissibility of evidence, we consider only the evidence in favor of the trial court's ruling and any unrefuted evidence in the defendant's favor. *Id.*

Mertz was a CHHS student at IPFW who was suspended from class because of an alleged violation of CHHS's "Human Services Code of Ethics." *Transcript* at 370. After the jury had been excused, Chang proffered Mertz's testimony. He described, in general terms, the reason he had been dismissed and the procedures he had initiated to successfully appeal

that dismissal. He detailed the participation of several of the same administrators and school officials who were involved in Chang's dismissal and appeal. The gravamen of his complaint was that IPFW had failed to follow procedures set out in, inter alia, Part II of the IPFW Code, entitled "Student Conduct Subject to Disciplinary Action." *Id.* at 364.

We note that although Mertz was CHHS student, he was not enrolled in the nursing program, as Chang was. His dismissal was premised upon an alleged violation of a different code (Human Services Code of Ethics) than was Chang's (Department of Nursing Professional Misconduct policy). The two codes implicated different procedural mechanisms. Moreover, we have already held that Chang's due process rights were not violated by virtue of the procedures employed in her case. We agree with the trial court that Mertz's situation, although perhaps superficially similar to Chang's, differed in significant ways such that his testimony would have little or no relevance to Chang's claims. The trial court did not err in excluding Mertz's testimony.

Grace Decker was a nursing student at IPFW. She was present at the incident that led to Chang's dismissal. Chang sought to call Decker as a witness at trial, explaining that Decker would testify about her perspective of the incident. Appellees objected and the trial court sustained the objection, explaining:

> We're not getting into that Mr. Roelke. That's not the issue before the jury. I have allowed some leeway to give the jury context of the dispute and that context, I think has been sufficient. We are not here to re-litigate whether or not the Department made the correct decision. That's not the issue before this Court so we're – if all she's doing is offering evidence as to the incident then no, I'm not going to allow that.

30

*Transcript* at 403.  In substantive terms, the trial court excluded Decker's testimony on the ground that it was irrelevant.

Rule 402 of the Indiana Rules of Evidence provides: "Evidence which is not relevant is not admissible."  "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Evid. R. 401.  We review a trial court's exclusion of evidence on grounds of relevance for an abuse of discretion.  *Carlson v. Warren*, 878 N.E.2d 844 (Ind. Ct. App.  2007).

We reiterate here that the two issues presented to the jury were: (1) what were the nature and terms of the contractual agreement between Chang and Purdue University, and (2) did Purdue breach its contract with Chang by failing to follow proper procedures in dismissing Chang?  Chang contends that Decker's testimony was relevant "to rebut the factual mistakes concerning the second student alleged to have been threatened which was both testified to and found in the documents such as the dismissal letter of Sternberger."  *Appellant's Brief* at 40.  We are hard-pressed to discern how further development of the evidence relative to the facts surrounding the incident implicates the questions before the jury – i.e., what procedures was IPFW contractually bound to follow in pursuing the ensuing disciplinary proceeding, and were those procedures followed? Decker's proposed testimony would not have aided the jury in answering those questions.  The trial court did not err in excluding Decker's testimony.

Judgment affirmed.

NAJAM, J., and BRADFORD, J., concur.