

FILED
Jan 30 2013, 8:51 am

CLERK
of the supreme court,
court of appeals and
tax court

# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**THOMAS D. COLLIGNON**
Collignon & Dietrick, P.C.
Indianapolis, Indiana

ATTORNEY FOR APPELLEES:

**CORY BRUNDAGE**
Cory Brundage, LLC
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| PETER F. AMAYA, | ) | |
| | ) | |
| Appellant-Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 49A04-1204-PL-208 |
| | ) | |
| D. CRAIG BRATER, M.D., in his capacity as | ) | |
| Dean and Director of Indiana University School | ) | |
| of Medicine; THE BOARD OF TRUSTEES OF | ) | |
| INDIANA UNIVERSITY; MEMBERS OF THE | ) | |
| STUDENT PROMOTIONS COMMITTEE; | ) | |
| PATRICIA TREADWELL, M.D., Chair of the | ) | |
| Student Promotions Committee; JOSEPH A. | ) | |
| DiMICCO, Ph.D.; KATHLEEN A. PRAG, M.D.; | ) | |
| and KLAUS A. HILGARTH, M.D., | ) | |
| | ) | |
| Appellees-Defendants. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Cynthia J. Ayers, Judge
Cause No. 49D04-1008-PL-37460

**January 30, 2013**

**OPINION - FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

Peter F. Amaya was dismissed from Indiana University School of Medicine for failure to maintain acceptable professional standards by allegedly cheating on an examination. He filed a lawsuit against D. Craig Brater, M.D., in his capacity as dean and director of Indiana University School of Medicine, the Board of Trustees of Indiana University, members of the Student Promotions Committee, Patricia Treadwell, M.D., chair of the Student Promotions Committee, Joseph A. DiMicco, Ph.D., Kathleen A. Prag, M.D., and Klaus A. Hilgarth, M.D. (hereinafter collectively referred to as "IUSM"), alleging multiple claims including breach of contract and breach of good faith and fair dealing. IUSM moved for summary judgment on those claims. Following a hearing, the trial court granted summary judgment in favor of IUSM. Amaya now appeals. The sole issue raised on appeal is whether the trial court erred when it entered summary judgment in favor of IUSM. Finding that no genuine issue of material fact remains on these claims and that judgment as a matter of law is appropriate, we affirm.

**Facts and Procedural History**

The relevant undisputed facts indicate that in the spring of 2010, Amaya, an Ohio resident, was a third-year medical student at Indiana University School of Medicine located in Indianapolis. He was attending medical school on scholarship. On March 29, 2010, Amaya sat for a combined mini-block examination consisting of Introduction to Clinical Medicine II, Pharmacology, and Pathology. Three professors, Drs. DiMicco, Hilgarth, and Prag, each observed Amaya during the examination and concluded that he was cheating by looking at the paper of the student to his right. On March 30, 2010, Dr. DiMicco confronted

Amaya with his observations, and Amaya denied cheating on the mini-block examination. On April 5, 2010, Dr. Hilgarth confronted Amaya with his observations and explained to Amaya that his behavior of looking into the workspace of the student to his right gave the appearance of cheating. Amaya denied that he cheated or that he engaged in any behavior that gave the appearance of cheating.[1] Amaya maintained that he was merely looking over and up at the clock on the right-hand wall of the testing room.

On April 21, 2010, Dr. Treadwell, the chair of the Student Promotions Committee (the "SPC"), wrote to Amaya and notified him that he had been accused of cheating by Drs. DiMicco and Hilgarth and that, if true, his behavior constituted a serious breach of professionalism and a violation of the medical school's Honor Code. Dr. Treadwell informed Amaya that a show cause hearing was scheduled for May 17, 2010, during which Amaya should appear before the SPC and explain why he should not be dismissed from medical school "for failure to maintain acceptable professional standards." Appellant's App. at 42. Amaya was provided copies of written correspondence from Drs. DiMicco, Hilgarth, and Prag, wherein they each explained the basis of their allegations of cheating.

Prior to the show cause hearing, Amaya met with James Brokaw, Ph.D., the associate dean for Admissions and Medical Student Affairs. The purpose of the meeting was for Dr. Brokaw to help Amaya prepare for his presentation to the SPC and to make sure that Amaya understood the process. On May 17, 2010, Amaya appeared before the SPC, made a PowerPoint presentation, and tendered a written submission including photographs, field

---

[1] Dr. Prag did not directly confront Amaya with her observations.

studies, timelines, and statistical analysis. Again, Amaya maintained that he was not looking at the other student's paper when he took the examination but was, instead, looking at the clock on the right-hand wall. Following the presentation, the SPC voted to table further deliberation of the case until June 7, 2010, so it could thoroughly review Amaya's information and then "deliberate with utmost seriousness and give due consideration to the evidence presented." *Id*. at 132.

Between May 17, 2010, and June 7, 2010, a seven-person subcommittee of the SPC continued to evaluate Amaya's information. The subcommittee directed additional written questions to Drs. DiMicco, Hilgarth, and Prag. On June 1, 2010, the subcommittee sent the written responses of Drs. DiMicco, Hilgarth, and Prag, to Amaya, and Amaya was permitted to reply to the SPC with his own written responses to their comments. The subcommittee also conducted field tests which consisted of members going to the testing location and sitting in Amaya's seat while other members observed the difference between glances up at the clock and glances to a neighbor's paper. The field tests revealed that "proctors can easily distinguish between glances up at the clock and glances down and to the right." *Id*. at 144.

On June 9, 2010, the SPC wrote to Amaya and informed him that based upon his presentation, all the written documentation and responses from the three witnesses, his responses thereto, as well as the results of field tests which evaluated his contention that he was merely looking at the clock, the SPC believed that "the preponderance of evidence supports the charge of ethical misconduct (cheating) during the mini-block exam on March 29, 2010." *Id.* The letter reminded Amaya that, pursuant to the medical school's Student

4

Handbook, "Dishonesty of any kind with respect to examinations … shall be considered cheating. It is the responsibility of the student not only to abstain from cheating but, in addition, to avoid the appearance of cheating …." *Id*. at 145. Amaya was informed that the SPC had voted to recommend to Dean Brater that Amaya be "dismissed from medical school for failure to maintain acceptable professional standards." *Id*. at 144. Amaya was also advised that, pursuant to the Student Handbook, he was entitled to request a reconsideration hearing.

Amaya requested reconsideration, and a reconsideration hearing was held on July 19, 2010. Amaya presented additional testimony and documentation. Thereafter, the SPC declined to reverse its earlier recommendation for dismissal. Amaya then appealed the SPC's recommendation to Dean Brater. Prior to meeting with Amaya, Dean Brater requested that an additional field test be conducted at the testing site in order to evaluate Amaya's contention that he was merely looking at the clock rather than at the other student's paper. The test revealed that the proctors "could tell what direction the accused was looking by eye movement alone." *Id*. at 150. On August 13, 2010, Dean Brater met with Amaya and reviewed all the material submitted by Amaya and considered by the SPC. On August 18, 2010, Dean Brater advised Amaya that he would not reverse the SPC's recommendation and that Amaya was dismissed from Indiana University School of Medicine.

On August 25, 2010, Amaya filed a verified complaint for temporary restraining order, preliminary injunction, permanent injunction, and other relief against IUSM. Following a hearing, the trial court denied Amaya's application for preliminary injunction on

5

September 27, 2010. Amaya's second amended verified complaint alleged count I, violation of due process, count II, dismissal not supported by substantial evidence, count III, violation of equal protection, count IV, breach of contract, and count V, breach of good faith and fair dealing.

On September 27, 2011, IUSM filed a motion for summary judgment and designation of evidence on counts IV and V. IUSM also filed a motion to dismiss counts I, II, and III. A hearing was held on both motions on February 22, 2012. On March 27, 2012, the trial court issued an order denying IUSM's motion to dismiss counts I and II and granting IUSM's motion to dismiss count III. In that same order, the trial court granted IUSM's motion for summary judgment as to counts IV and V.

Finding no just reason for delay, the trial court entered final judgment as to counts III, IV, and V on April 9, 2012.[2] Amaya now appeals the trial court's entry of summary judgment on counts IV and V. We will state additional facts in our discussion where necessary.

### Discussion and Decision

When reviewing a trial court's order granting summary judgment, we apply the same standard as the trial court. *Kopczynski v. Barger*, 887 N.E.2d 928, 930 (Ind. 2008). Summary judgment is appropriate only where the designated evidentiary matter shows "that there is no genuine issue as to any material fact and that the moving party is entitled to

---

[2] Apparently, as of the date of the filing of Amaya's appellant's brief, IUSM has a motion for summary judgment on counts I and II pending before the trial court. Appellant's Br. at 2.

6

judgment as a matter of law." Ind. Trial Rule 56(C). A fact is material if its resolution would affect the outcome of the case. *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009). An issue is genuine if the trier of fact is required to resolve the parties' differing accounts of the truth or if the undisputed material facts support conflicting reasonable inferences. *Id*.

On appeal, we must determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law. *First Farmers Bank & Trust Co. v. Whorley*, 891 N.E.2d 604, 607-08. (Ind. Ct. App. 2008), *trans. denied*. In doing so, we consider the designated evidence in the light most favorable to the non-moving party. *Id*. at 608. A trial court's grant of summary judgment arrives on appeal cloaked with a presumption of validity, and the appellant bears the burden of demonstrating that the grant of summary judgment was erroneous. *Cox v. N. Ind. Pub. Serv. Co.,* 848 N.E.2d 690, 695-96 (Ind. Ct. App. 2006).

Here, the trial court entered findings of fact and conclusions thereon in support of its summary judgment ruling. We note that the trial court is not required to provide written findings and conclusions on summary judgment and that the conclusions are not binding on appeal. *First Farmers Bank*, 891 N.E.2d at 608. However, the trial court's findings and conclusions offer us valuable insight into the trial court's rationale that facilitates our appellate review. *Id*. We may affirm based on any theory argued by the parties and supported by the record. *Shepard v. Schurz Commc'ns, Inc.*, 847 N.E.2d 219, 224 (Ind. Ct. App. 2006).

We begin by noting that in counts IV and V, Amaya raises two separate theories of liability against IUSM: (1) breach of contract, and (2) breach of the duty of good faith and fair dealing. While we will later explain the nature of the contractual relationship between student and university, we agree with IUSM that a separate cause of action for alleged breach of duty of good faith and fair dealing is inapposite here. The duty of good faith and fair dealing is a concept created by the Uniform Commercial Code and restricted to contracts for the sale of goods and is also a concept which our courts have expanded to insurance contracts as a cause of action sounding in tort. *See Ford Motor Credit Co. v. Garner*, 688 F. Supp. 435, 442 (N.D. Ind. 1988) (finding that duty of good faith supplied by Indiana's Uniform Commercial Code is specifically restricted to contracts within Indiana Code Article 26-1); *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 519 (Ind. 1993) (recognizing that insurance companies have an implied contractual duty of good faith the breach of which sounds in tort; damages for breach of duty of good faith likely to be coterminous with those recoverable in breach of contract action). As Amaya fails to direct us to, and we are unaware of, any authority for the proposition that a separate cause of action for breach of good faith exists here, we conclude that counts IV and V of Amaya's complaint are duplicative and raise only one claim for breach of contract against IUSM. Accordingly, the sole issue for our determination on appeal is whether the trial court erred when it entered summary judgment on Amaya's claim for breach of contract.

In *Neel v. Indiana University Board of Trustees*, 435 N.E.2d 607, 610 (Ind. Ct. App. 1982), we characterized the legal relationship between a student and a university as one of

8

implied contract. We explained that, although courts have analyzed the relationship under many different legal doctrines, "[t]he most pervasive and enduring theory is that the relationship between a student and an educational institution is contractual in nature. The terms of the contract, however, are rarely delineated, nor do the courts apply contract law rigidly." *Id*. at 610. It is generally well accepted that the catalogues, bulletins, circulars, and regulations of a university made available to the matriculant become of part of the contract. *See Ross v. Creighton Univ.*, 957 F. 2d 410, 416 (7th Cir. 1992) (noting consensus from numerous states).

Indiana courts have taken a very flexible approach to the scope of contractual promises between students and universities and have noted that hornbook rules cannot be "applied mechanically where the principal is an educational institution" and the result would be to override an academic determination. *Neel*, 435 N.E.2d. at 611 (citations omitted). Indeed, "[b]ecause such determinations rest in most cases upon the subjective professional judgment of trained educators, the courts have quite properly exercised the utmost restraint in applying traditional legal rules to disputes within the academic community." *Id*. Accordingly, although an implied contract exists between the student and the university, the nature of the terms vary:

> In the area of academic services, the courts' approach has been similar to that used with contracts conditioned upon the satisfaction of one party. The university requires that the student's academic performance be satisfactory to the university in its honest judgment. Absent a showing of bad faith on the part of the university or a professor, the court will not interfere. The good faith judgment model both maximizes academic freedom and provides an acceptable approximation of the educational expectations of the parties.

*Id*; *Gordon v. Purdue Univ.*, 862 N.E.2d 1244, 1251 (Ind. Ct. App. 2007).

In this context, "bad faith is not simply bad judgment or negligence[, r]ather, it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity." *Gordon*, 862 N.E.2d at 1251. Literal adherence by a university to its internal rules will not be required when the dismissal of a student "rests upon expert judgments as to academic or professional standards and such judgments are fairly and nonarbitrarily arrived at." *Neel*, 435 N.E.2d at 612 (citation omitted). In other words, the sole function of courts is to determine whether the educational institution acted illegally, arbitrarily, capriciously, or in bad faith. *Neel*, 435 N.E.2d at 613; *Gordon*, 862 N.E.2d at 1252; *Gagne v. Trs. of Ind. Univ.*, 692 N.E.2d 489, 496 (Ind. Ct. App. 1998), *trans. denied*.

Amaya's claims regarding IUSM's alleged breach of contract are so voluminous that we choose not to reproduce them here. In short, he contends that IUSM breached its implied contract with him by failing to publish "its standards and procedures for the evaluation, advancement, and graduation of its students and for disciplinary action" in accordance with the accreditation standards of the Liaison Committee on Medical Education ("LCME") and the Indiana University Code of Student Ethics. Appellant's Br. at 15. He also contends that IUSM failed to follow its own internal policies and procedures for disciplinary misconduct and to "guarantee students in the unit a fair opportunity to be heard consistent with the

standards of evidence and due process found" in the Code of Student Ethics and the LCME's accreditation standards. *Id*. at 16.[3]

However, even assuming that an implied contract existed between Amaya and IUSM, and even assuming that IUSM failed to strictly follow the procedures outlined in all its handbooks and codes or to publish its procedures in specific accordance with accreditation standards as asserted by Amaya, that does not automatically lead to a finding of breach of contract on the part of IUSM. It is well settled that before a court will intervene into the implied contractual relationship between student and university, there must be some evidence that the university acted arbitrarily or in bad faith. *See Neel*, 435 N.E.2d at 613; *Gordon*, 862 N.E.2d at 1252; *Gagne v. Trs. of Ind. Univ.*, 692 N.E.2d 489, 496 (Ind. Ct. App. 1998), *trans. denied*. Amaya has failed to designate any such evidence here.

IUSM's Student Handbook provides that the SPC is appointed by the dean to monitor student academic and professional standards as determined by the faculty. Appellant's App. at 205. Section V(F), entitled "Dismissal," provides that "[a] student may be required to meet with the [SPC] to show cause why he/she should not be dismissed from school when he/she: … H. has been cited for lack of acceptable academic ethics or professional behavior." *Id*. at 206. The designated evidence indicates that three faculty members observed Amaya cheating during the mini-block examination. Amaya was informed of these observations and was requested to prepare for a show cause hearing before the SPC. Amaya appeared before

---

[3] Although we decline to address Amaya's claims regarding the LCME accreditation standards in detail, we note our agreement with the trial court that the LCME accreditation standards do not form part of the implied contract between Amaya and IUSM. The LCME accreditation standards are part of an agreement between the LCME and IUSM. Appellant's Br. at 40 (Conclusion 11).

11

the SPC and presented a PowerPoint presentation. He also "tendered voluminous written material, including photographs, field studies, experts' reports, timelines, and statistical analysis." *Id*. at 15. Following Amaya's presentation, the SPC tabled its vote in order to further deliberate and thoroughly review Amaya's information. The SPC also asked for written submissions from the three faculty members and from Amaya. Thereafter, Amaya was informed that a subcommittee of the SPC had conducted field tests to determine the validity of the information he had submitted. Considering the results of those field tests as well as the written responses to additional questions, the SPC determined that the evidence supported the charge of cheating. Amaya was granted his request for a reconsideration hearing as provided by section VI of the Student Handbook. *Id*. at 206. When the SPC declined to reverse its decision, Amaya was then afforded the opportunity to meet with the dean for further review as provided for in the Student Handbook. *Id*. at 207. After considering all the evidence presented, the Dean determined that dismissal was warranted.

Based upon the record before us, we conclude that IUSM substantially followed its published procedures for dismissal, and Amaya has failed to designate any evidence to indicate that IUSM's decision to dismiss Amaya was arbitrary, capricious, or made in bad faith. IUSM's conclusion that Amaya failed to maintain acceptable professional standards was a rational determination arrived at after much deliberation and after Amaya had numerous opportunities to be heard and to explain his behavior. In support of his assertion that IUSM acted in bad faith, Amaya makes various conclusory allegations including that Dr. DiMicco withheld evidence, that Dr. Brokaw misled him during his meeting, that Dr.

12

Treadwell misled him during the show cause hearing, that the SPC inappropriately speculated regarding facts, and that Dean Brater failed to disclose the second field test to him. However, we agree with the trial court that other than these conclusory allegations, Amaya has failed to designate any facts which would support a reasonable inference that IUSM engaged in "the conscious doing of a wrong because of dishonest purpose or moral obliquity" or had "a state of mind affirmatively operating with furtive design or ill will." *Gordon*, 862 N.E.2d at 1253.

We note that our judicial deference to the foregoing expert judgments as to Amaya's failure to meet professional standards is dictated by the fact that the administrators and directors of IUSM have a duty to the public as well as to the student. To place incompetent, irresponsible, or unethical doctors into active practice would surely be to the detriment of the health and safety of the members of society. *See Neel*, 435 N.E.2d at 613 (noting that directors of dental school have duty to refrain from placing irresponsible dentists into private practice). Courts are ill-equipped to second-guess professional judgments that are non-arbitrarily arrived at.

Amaya has not met his burden to establish that the trial court erred when it entered summary judgment on his breach of contract claim. No genuine issue of material fact remains on this issue. Accordingly, judgment as a matter of law in favor of IUSM is appropriate. We affirm the trial court's entry of summary judgment on counts IV and V of Amaya's second amended complaint.

13

Affirmed.

ROBB, C.J., and BARNES, J., concur.