## FOR PUBLICATION



FILED
Sep 03 2013, 5:43 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**THOMAS D. COLLIGNON**
Collignon & Dietrick, P.C.
Indianapolis, Indiana

ATTORNEY FOR APPELLEES:

**CORY BRUNDAGE**
Cory Brundage LLC
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| PETER F. AMAYA, | ) | |
| | ) | |
| Appellant-Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 49A04-1212-PL-620 |
| | ) | |
| D. CRAIG BRATER, M.D., IN HIS | ) | |
| CAPACITY AS DEAN AND DIRECTOR | ) | |
| OF INDIANA UNIVERSITY SCHOOL OF | ) | |
| MEDICINE; THE BOARD OF TRUSTEES | ) | |
| OF INDIANA UNIVERSITY; MEMBERS | ) | |
| OF THE STUDENT PROMOTIONS | ) | |
| COMMITTEE; PATRICIA TREADWELL, | ) | |
| M.D., CHAIR OF THE STUDENT | ) | |
| PROMOTIONS COMMITTEE; JOSEPH | ) | |
| A. DIMICCO, PH.D.; KATHLEEN A. PRAG, | ) | |
| M.D.; and KLAUS A. HILGARTH, M.D., | ) | |
| | ) | |
| Appellees-Defendants. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Cynthia J. Ayers, Judge
Cause No. 49D04-1008-PL-37460

**September 3, 2013**

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

Peter F. Amaya was dismissed from Indiana University School of Medicine ("IUSM") for failure to maintain acceptable professional standards by allegedly cheating on an examination. Amaya appeals the trial court's summary judgment ruling in favor of D. Craig Brater, M.D., in his capacity as Dean and Director of IUSM; the Board of Trustees of Indiana University; Members of the Student Promotions Committee ("the SPC"); Patricia Treadwell, M.D., Chair of the Student Promotions Committee; Joseph A. DiMicco, Ph.D.; Kathleen A. Prag, M.D.; and Klaus A. Hilgarth, M.D., (collectively, the "University") with respect to his claim that his due process rights were violated resulting in his expulsion from IUSM. Amaya raises several issues, which we revise and restate as whether the trial court erred in granting the University's motion for summary judgment with respect to his claims that he was not afforded due process and that his dismissal is not supported by substantial evidence.[1] We affirm.

## FACTS

In the spring of 2010, Amaya was a third-year medical student at IUSM in Indianapolis. Amaya v. Brater, 981 N.E.2d 1235, 1236-1237 (Ind. Ct. App. 2013), reh'g denied, trans. denied.[2] On March 29, 2010, Amaya sat for a mini-block exam consisting of Introduction to Clinical Medicine II, Pharmacology, and Pathology. Id. at 1237. Three professors, Dr. DiMicco, Dr. Hilgarth, and Dr. Prag, each observed Amaya during the examination and concluded that he was cheating by looking at the paper of the

---

[1] Amaya alleged multiple claims, and this court has already affirmed the trial court's entry of summary judgment in favor of the University with respect to his claims of breach of contract and breach of good faith and fair dealing. Amaya v. Brater, 981 N.E.2d 1235 (Ind. Ct. App. 2013), reh'g denied, trans. denied.

[2] The recited facts are taken in part from this court's previous opinion related to Amaya's lawsuit against the University in Amaya, 981 N.E.2d 1235.

student to his right.  Id.  On March 30, 2010, Dr. DiMicco confronted Amaya with his observations, and Amaya denied cheating.  On April 5, 2010, Dr. Hilgarth confronted Amaya with his observations and explained to Amaya that his behavior of looking into the workspace of the student to his right gave the appearance of cheating.  Id.  Amaya denied that he cheated or that he engaged in any behavior that gave the appearance of cheating and maintained that he was merely looking over and up at the clock on the right-hand wall of the testing room.  Id.

On April 21, 2010, Dr. Treadwell, the chair of the SPC, wrote to Amaya and notified him that he had been accused of cheating by Dr. DiMicco and Dr. Hilgarth and that, if true, his behavior constituted a serious breach of professionalism and a violation of the school's honor code.  Id.  Dr. Treadwell informed him that a show cause hearing was scheduled for May 17, 2010, during which Amaya should appear before the SPC and explain why he should not be dismissed from the school for failure to maintain acceptable professional standards.  Id.  Amaya was provided copies of written correspondence from Dr. DiMicco, Dr. Hilgarth, and Dr. Prag, in which they explained the basis of their allegations of cheating.  Id.

Prior to the show cause hearing, Amaya met with James Brokaw, Ph.D., the associate dean for Admissions and Medical Student Affairs, to help Amaya prepare for his presentation to the SPC and to make sure that he understood the process.  Id.

On May 17, 2010, a hearing was held before the SPC, at which Amaya made a PowerPoint presentation and tendered a written submission including photographs, field studies, timelines, and statistical analysis.  Id.  He maintained that he was not looking at

3

the other student's paper when he took the examination but was, instead, looking at the clock on the right-hand wall. Id.

In a letter dated May 21, 2010, Dr. Treadwell stated that the SPC voted to table further deliberation of the case until the information Amaya presented could be thoroughly reviewed, that "[t]he gravity of the allegations requires that we deliberate with utmost seriousness and give due consideration to the evidence presented," that the SPC would meet again on June 7, 2010, and that it was her hope that a final decision could be reached at that time. Appellant's Appendix at 134.

Between May 17, 2010, and June 7, 2010, a seven-person subcommittee of the SPC continued to evaluate Amaya's information. Amaya, 981 N.E.2d at 1237. The subcommittee directed additional written questions to Dr. DiMicco, Dr. Hilgarth, and Dr. Prag, the subcommittee sent the written responses of the professors to Amaya on June 1, 2010, and Amaya was permitted to reply to the SPC with his own written responses to their comments. Id. In addition, the subcommittee conducted field tests, which consisted of members going to the testing location and sitting in Amaya's seat while other members observed the difference between glances up at the clock and glances to a neighbor's paper. Id. The field tests revealed that the professors could easily distinguish between glances up at the clock and glances down and to the right. Id. On June 7, 2010, the SPC held a meeting and discussed the evidence presented by Amaya at the May 17, 2010 hearing.

On June 9, 2010, Dr. Treadwell sent a letter on behalf of the SPC to Amaya stating that the SPC met on June 7, 2010 to discuss the evidence Amaya presented, that since the

4

May 17, 2010 hearing a seven-person subcommittee, chaired by Dr. Treadwell, carefully evaluated Amaya's written documentation, and that the SPC discussed Amaya's case at length and weighed the eyewitness accounts of Dr. DiMicco, Dr. Hilgarth, and Dr. Prag versus the innocuous explanation Amaya presented in his documentation. The letter advised that the SPC did not find Amaya's arguments to be compelling and believed the preponderance of evidence supports the charge of ethical misconduct during the mini-block exam on March 29, 2010, that accordingly the SPC voted to recommend to the Dean that Amaya be dismissed from IUSM, that the vote was ten for dismissal, three against, and three abstentions, and that the decision was not reached lightly but with due deliberation commensurate with the gravity of the allegations and the consequences of an adverse vote. The letter further stated that "[f]ield tests conducted by subcommittee members from the individuals sitting in [Amaya's] seat revealed that proctors can easily distinguish between glances up at the clock and glances down and to the right," that the SPC "considers it highly unlikely that all three proctors could have been mistaken in their interpretation of [Amaya's] behavior," and that the testing "revealed that someone sitting in [Amaya's] seat making sidelong glances to the right can see the bubble sheet (or circled answers on the exam) of someone sitting two chairs to the right." Appellant's Appendix at 146. The letter went on to say that "[t]his is sufficient to identify the selected answers," that "[t]he primary evidence against [Amaya] is the eyewitness accounts," that "[t]he statistical evidence is secondary but supports the eyewitness accounts," that Amaya's "statistical consultants' calculations about the likelihood of two exams having the same degree of answer concordance as observed in your case assumes

5

no other factors other than chance," and that Amaya's "observed behavior must be taken into account, which makes it much more likely that cheating explains the degree of concordance." Id. at 146-147. The letter also advised Amaya that he may request a reconsideration hearing.

Amaya requested reconsideration, and a hearing was held on July 19, 2010, at which Amaya presented additional testimony and documentation, including new documentary material (which did not address the field tests performed by members of the subcommittee) and a new PowerPoint presentation. Amaya, 981 N.E.2d at 1238. The SPC declined to reverse its earlier recommendation for dismissal. Id. Amaya then appealed the SPC's recommendation to Dean Brater. Id.

Prior to meeting with Amaya, Dean Brater requested that an additional field test be conducted at the testing site in order to evaluate Amaya's contention that he was merely looking at the clock rather than at the other student's paper. Id. The test revealed that the proctors could tell what direction the accused was looking by eye movement alone. Id. On August 13, 2010, Dean Brater met with Amaya and reviewed all the material submitted by Amaya and considered by the SPC. Id. On August 18, 2010, he advised Amaya that he would not reverse the SPC's recommendation and that Amaya was dismissed from IUSM. Id.

## PROCEDURAL HISTORY

On August 25, 2010, Amaya filed a verified complaint for temporary restraining order, preliminary injunction, permanent injunction, and other relief against the University. Id. The trial court denied Amaya's application for preliminary injunction.

6

Id. Amaya later filed a second amended verified complaint which alleged: Count I, violation of due process; Count II, dismissal is not supported by substantial evidence; Count III, violation of equal protection; Count IV, breach of contract; and Count V, breach of good faith and fair dealing. Id.

In September 2011, the University filed a motion for summary judgment and designation of evidence with respect to Counts IV and V and a motion to dismiss with respect to Counts I, II, and III. Id. On February 22, 2012, the court held a hearing on the motions. Id. On March 27, 2012, the court entered an order denying the University's motion to dismiss with respect to Counts I and II, granting the University's motion to dismiss with respect to Count III, and granting the University's motion for summary judgment with respect to Counts IV and V. Id. Amaya appealed the trial court's summary judgment ruling in favor of the University on Counts IV and V, and this court affirmed the summary judgment ruling on January 30, 2013. Id. at 1242.

Meanwhile, on April 11, 2012, the University filed a second motion for summary judgment and designation of evidence with respect to Counts I and II of Amaya's second amended complaint. Id. at 1238 n.2. On October 10, 2012, the court held a hearing on the motion.

On November 14, 2012, the trial court issued an order granting the University's second motion for summary judgment as to Counts I and II of Amaya's second amended verified complaint.[3] The court made a number of findings, which included that "[o]n June 9, 2010, the SPC informed Amaya in writing that the SPC had also considered

---

[3] This order was an amended order. The CCS shows that the court first entered an order granting the University's motion on November 13, 2012.

Amaya's written responses to the sub-committee's written questions and that the SPC had evaluated Amaya's presentation materials concerning sight-lines and angles of view by conducting 'field tests,'" that Amaya was notified "that some members of the sub-committee had gone to the testing location and actually sat in Amaya's seat, where the members could 'easily distinguish between glances up at the clock and glances down to the right,'" and that "Amaya put the question of his line of sight at issue and the sub-committee of the SPC conducted a 'field test' as part of its deliberate process before the resumption of the initial hearing on June 7, 2010." Appellant's Appendix at 18-19. The order further noted the reconsideration hearing and the testimony and documentation presented.

The court further found that on August 12, 2010, Dean Brater requested one of the SPC subcommittee members who had previously gone to sit in Amaya's seat in the prior field tests "to go back with two associates to double check whether Amaya could have seen his neighbor's paper without rotating his head and whether he could have seen the answers marked on the 'scantron' answer sheet," that the member reported that Amaya "could have seen his neighbor's paper without moving his head to the right, could have seen the answers, and the proctors 'could tell what direction the accused was looking by eye movement alone,'" and that Amaya had no opportunity to respond to this new field test. Id. at 20. The court's order found that on August 13, 2010, "at Amaya's request, an appeal meeting was held with Dean Brater, who received all the record and considered Amaya's appeal," at which "Dean Brater stated that, in cases such as Amaya's, there was 'no definitive evidence' of cheating and there was a chance of a 'false positive' or a 'false

8

negative' in his decision," and that on August 18, 2010, Dean Brater advised Amaya that he would not reverse the decision to dismiss Amaya from IUSM. Id.

In its conclusions of law, the court concluded, with respect to Amaya's claim alleging a violation of due process, that "[w]hile the [SPC] did conduct *ex parte* field tests after the May 17, 2010 show cause hearing, [Amaya] was notified of the *ex parte* field tests in a letter dated June 9, 2010 and [] had the opportunity to request a reconsideration hearing and respond to the *ex parte* field tests," that the July 19, 2010 reconsideration hearing was held at his request where he "had the opportunity to respond, explain, and defend in response to the June 9, 2010 letter where Amaya was informed of the *ex parte* field tests," and that "[i]t was at the point of the July 19, 2010 hearing that Amaya was provided with the fundamental right to due process . . . ." Id. at 23. The court also concluded that "[w]hen Dean Brater requested a final ex parte 'field test' on August 12, 2010, at this point of the appeal the fundamental right to due process . . . had already been met," and that "[t]hus, the August 13, 2010 meeting was not even required." Id. at 24.

With respect to Amaya's claim alleging that his dismissal was not supported by substantial evidence, the court concluded "that the observations of Drs. DiMicco, Hilgarth, and Prag of Amaya during the March 29, 2010 'mini-block' examination at IUSM along with all of the evidence presented and considered at the May 17, 2010 and July 19, 2010 hearings provided the requisite amount of evidence necessary to support the [SPC's] decision that 'the evidence supports the charge of ethical misconduct (cheating)' and that Amaya would be dismissed from IUSM 'for failure to maintain

9

acceptable professional standards.'" Id. at 25. The court found there was no genuine issue of material fact as to Counts I and II of the complaint and granted the University's second motion for summary judgment as to those claims.

## ISSUE AND STANARD OF REVIEW

The issue is whether the trial court erred in granting the University's motion for summary judgment. When a trial court's ruling granting or denying summary judgment is challenged on appeal, our standard of review is the same as it is for the trial court. Kroger Co. v. Plonski, 930 N.E.2d 1, 4 (Ind. 2010). The moving party bears the initial burden of making a *prima facie* showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law." Gill v. Evansville Sheet Metal Works, Inc., 970 N.E.2d 633, 637 (Ind. 2012). Summary judgment is improper if the moving party fails to carry its burden, but if it succeeds, then the non-moving party must come forward with evidence establishing the existence of a genuine issue of material fact. Id. We construe all factual inferences in favor of the non-moving party and resolve all doubts as to the existence of a material issue against the moving party. Plonski, 930 N.E.2d at 5. An appellate court reviewing a challenged trial court summary judgment ruling is limited to the designated evidence before the trial court, see Ind. Trial Rule 56(H), but is constrained to neither the claims and arguments presented at trial nor the rationale of the trial court ruling, see Woodruff v. Ind. Family & Soc. Servs. Admin., 964 N.E.2d 784, 790 (Ind. 2012) ("We will reverse if the law has been incorrectly applied to the facts. Otherwise, we will affirm a grant of summary judgment upon any theory supported by evidence in the record."); Wagner v. Yates, 912 N.E.2d 805, 811 (Ind.

2009) ("[W]e are not limited to reviewing the trial court's reasons for granting or denying summary judgment but rather we may affirm a grant of summary judgment upon any theory supported by the evidence.").

The entry of specific findings and conclusions does not alter the nature of a summary judgment which is a judgment entered when there are no genuine issues of material fact to be resolved. Rice v. Strunk, 670 N.E.2d 1280, 1283 (Ind. 1996). In the summary judgment context, we are not bound by the trial court's specific findings of fact and conclusions of law. Id. They merely aid our review by providing us with a statement of reasons for the trial court's actions. Id.

## DISCUSSION

Amaya maintains that his due process rights under the federal and state constitutions were violated resulting in his expulsion from IUSM and that his dismissal was arbitrary and capricious and not based upon substantial evidence.

### PART I: AMAYA'S CLAIM HE WAS DENIED DUE PROCESS

A.  Arguments of the Parties

With respect to his due process rights, Amaya maintains that he was dismissed for disciplinary reasons for an alleged violation of the honor code and not for academic reasons and that, "[a]s such, fundamental due process requires notice and an opportunity for a hearing appropriate to the case" and that "[i]n order to be fair in the due process sense, the hearing must afford the person adversely affected the opportunity to respond, explain, and defend." Appellant's Brief at 12-13. He contends that he is entitled to notice of all evidence against him and an opportunity to respond to all evidence against

11

him at a meaningful time and in a meaningful way, that he is entitled to due process protection in both the determination of misconduct and the determination of the appropriate sanction, that the SPC placed him on probation without notice of an opportunity to respond on April 19, 2010, and that he first learned he had been placed on probation on August 2, 2010. He states that he was notified on April 21, 2010 to appear before the SPC on May 17, 2010 to show cause why he should not be dismissed for ethical misconduct, that SPC's procedures permit the SPC to require a student to show cause why he should not be dismissed from school when he "has been cited for lack of acceptable academic ethics or professional behavior," that "[t]he SPC may only issue a rule to show cause if the student 'has been cited.' Past tense," and that "[i]n order to issue the Show Cause letter on April 21, 2010, the SPC necessarily determined and cited Amaya for lack of acceptable academic ethics or professional behavior on April 19, 2010, all without notice or opportunity to respond." Id. at 15-16.

Amaya further contends that his rights to due process and due course of law were violated when the SPC and Dean Brater relied on *ex parte* evidence gathered after the May 17, 2010 show cause hearing. He asserts that the documentation included in the April 21, 2010 notification he received was the first time he saw the specific allegations and witness statements against him, that the accusations and observations contained within those documents "focused solely on the mini-block exams, which were held on March 29, 2010," that he advised the University that, if the SPC intended to allege any facts outside the scope of the documents, then he demanded that he receive immediate notice, and that he conducted a field test of the testing site and retained others to provide

statistical analyses of the mini-block exam. Id. at 17. Amaya argues that he was required to meet with Dr. Brokaw to share his anticipated response for the show cause hearing, that he met with Dr. Brokaw and shared his PowerPoint presentation, that Dr. Brokaw did not inform him that the SPC had already placed him on probation, and that Dr. Brokaw attempted to dissuade him from presenting the defense. Amaya asserts that, at the May 17, 2010 meeting, he presented his PowerPoint presentation and a written submission for the SPC's consideration, that his presentation addressed his innocence and did not address mitigating a sanction, that Dr. DiMicco "considered [Amaya's] effort to defend himself rather than apologize as 'distasteful'" and that "Dr. Frankel, a member of the SPC, considered Amaya's effort to defend himself against the allegations, rather than apologize, as 'belligerent.'" Id. at 19.

Amaya contends that, while the SPC tabled the deliberations following the meeting and Dr. Treadwell stated that the SPC was deliberating and giving due consideration to the evidence presented, "the SPC was, in reality, and without notice to Amaya, secretly creating a subcommittee chaired by Dr. Treadwell to conduct additional 'field tests,'" that "Treadwell obviously knew this fact [but] chose not to disclose to Amaya that the SPC was collecting and considering additional evidence in Amaya's case," and that "[t]he SPC's secretive acts of obtaining and considering evidence outside the hearing, with no notice or opportunity for Amaya to respond, is a fundamental denial of due process." Id. at 19-20. Amaya argues that the SPC procedures "do not provide for a rehashing of evidence." Id. at 22. He posits that the trial court's findings of fact fail to consider that he had previously requested and was not provided all documentation that

the SPC would consider in its decision, and that he "was never provided a copy of the summary of observations, each subcommittee member's personal observation, or the method and means of the 'field test.'" Id. He further states that the court's findings "ignore that, even after the July 19, 2010 Reconsideration Hearing, Dean Brater, the only person who can expel a student, requested and relied on a second *ex parte* investigation." Id. at 22-23.

The University maintains that Amaya was not deprived of any constitutional right. It initially argues that there is no constitutional right to a graduate school education, that Amaya's claim to a constitutional right is based on out-of-date dicta, and that subsequent court decisions have noted that the opportunity to receive a post-secondary education from an accredited graduate school program has not received recognition as a fundamental right. The University further contends that, even if Amaya could support a claim of constitutional right, he received all the process due him, and that this court has already ruled that its actions were not arbitrary and capricious.

The University's position is that none of Amaya's alleged deficiencies in the process he received amount to a denial of due process. Among the University's contentions are that the issue of when Amaya was placed on probation is a red-herring as this appeal is from his dismissal from IUSM and not from any temporary probation, that his placement on probation did not predetermine the outcome, and that his probation and the temporary suspension of his scholarship became moot when he was dismissed. The University further contends that there was no *ex parte* evidence which was kept secret from Amaya or which he had no opportunity to confront.

B.    Due Process Analysis

The Fourteenth Amendment provides that no state shall deprive any person of life, liberty or property without due process of law.  U.S. CONST. AMEND. XIV, § 1.  Article 1, section 12, of the Indiana Constitution contains a similar provision and has been construed by our courts as analogous to the federal due process clause.  See Reilly v. Daly, 666 N.E.2d 439, 443-444 (Ind. Ct. App. 1996), trans. denied.  This court has held that a student's interest in pursuing an education is included within the Fourteenth Amendment's protection of liberty and property, and a student facing expulsion from a public educational institution is entitled to the protections of due process.  Gagne v. Trustees of Ind. Univ., 692 N.E.2d 489, 493 (Ind. Ct. App. 1998) (citing Reilly, 666 N.E.2d at 444), trans. denied.

In Reilly, this court noted that, in the case of an academic dismissal, due process requires only the barest procedural protections.  666 N.E.2d at 444.  In Gagne, we noted, citing Reilly, that when a sanction is imposed for disciplinary reasons the fundamental requirements of due process are notice and an opportunity for a hearing appropriate to the nature of the case.  Gagne, 692 N.E.2d at 493.  In order to be fair in the due process sense, the hearing must afford the person adversely affected the opportunity to respond, explain, and defend.  Id.  "For school expulsion, due process requires an informal give-and-take between the student and the disciplinarian, where the student is given an opportunity to explain his version of the facts."  Id.  Due process further requires that a university base an expulsion on substantial evidence.  Id.  We also stated in Reilly that courts have refused to require the traditional formalities of legal proceedings in school

15

suspension and dismissal hearings and that due process requires "not an elaborate hearing before a neutral party, but simply an informal give-and-take between student and disciplinarian which gives the student an opportunity to explain his version of the facts." Reilly, 666 N.E.2d at 444 (internal quotation marks and citations omitted).

Assuming that Amaya had or has a liberty or property interest in pursuing a medical career and in remaining a medical student at IUSM, and whether Amaya's dismissal is characterized as academic or disciplinary, Amaya was informed of the allegations against him, he had the opportunity to explain his version of the facts, the procedures employed and the ultimate recommendation and decision of the SPC and Dean Brater were careful and deliberate, and Amaya was not denied due process as required under the Fourteenth Amendment and Article 1, section 12 of the Indiana Constitution.

With respect to his contention that he was not provided with notice or an opportunity to respond to the evidence against him in a meaningful way, and that he is entitled to due process protection in both the determination of misconduct and the determination of the appropriate sanction, the designated evidence shows, and Amaya does not challenge, that he received notice of the allegations against him of cheating on the mini-block exam on March 29, 2010. Dr. Treadwell's letter to Amaya on April 21, 2010, notified him that he had been accused of cheating and that, if true, his behavior constituted a serious breach of professionalism and a violation of the school's honor code, and that he should appear before the SPC on May 17, 2010 and explain why he should not be dismissed from the school for failure to maintain acceptable professional

16

standards. Amaya was provided copies of written correspondence from Dr. DiMicco, Dr. Hilgarth, and Dr. Prag, in which they explained their allegations of cheating and he was given the opportunity to explain his version of the facts. Prior to the May 17, 2010 hearing, he met with Dr. Brokaw to help him prepare for his presentation to the SPC and to make sure that Amaya understood the process. On May 17, 2010, Amaya appeared before the SPC, gave a PowerPoint presentation, and tendered a written submission including photographs, field studies, timelines, and statistical analysis. He said that he was not looking at the other student's paper when he took the examination but was, instead, looking at the clock on the right-hand wall.

With respect to the field tests by members of the subcommittee of the SPC after the May 17, 2010 hearing, the designated evidence shows that Amaya received notice by letter dated June 9, 2010 that the field tests had been conducted and that the tests "revealed that proctors can easily distinguish between glances up at the clock and glances down and to the right," that "someone sitting in [Amaya's] seat making sidelong glances to the right can see the bubble sheet (or circled answers on the exam) of someone sitting two chairs to the right," and that "[t]his is sufficient to identify the selected answers." Appellant's Appendix at 146. The SPC held a reconsideration hearing on July 19, 2010, at which Amaya presented additional testimony, the documents and PowerPoint presentation presented at the May 7, 2010 hearing, the written responses of the professors to questions of the SPC and Amaya's responses, new documentary material prepared for the reconsideration hearing, and a new PowerPoint presentation. While Amaya did not address the results of the field tests performed by members of the subcommittee and

17

discussed in the June 9, 2010 letter, he had the opportunity to do so. Further, although Dean Brater requested an additional field visit, he reviewed all of the material submitted by Amaya and considered by the SPC, and the additional field visit did not differ from, and the results were not inconsistent with, the previous field tests and results. There is no indication that Dean Brater's decision turned on the results of the requested additional field test in light of the evidence presented before the SPC or the recommendation of the SPC that Amaya be dismissed from IUSM. Amaya was aware that he faced dismissal, and he was afforded opportunities to address the allegations against him, including the statements of the professors who observed him in the exam room and the results of the field tests performed by members of the subcommittee of the SPC, at the May 17, 2010 hearing, the July 19, 2010 hearing, and his August 13, 2010 meeting with Dean Brater.

Further, we find Amaya's argument that his placement on probation in April 2010 shows that the "die was cast and his guilt had been previously determined," see Appellant's Reply Brief at 9, to be unpersuasive. Amaya was afforded opportunities to address the allegations against him and explain his version of the facts before the SPC and to Dean Brater, and the designated evidence demonstrates that the SPC and Dean Brater were deliberative and careful in their determination of Amaya's dismissal.

Based upon the designated evidence, we cannot say that Amaya was denied at least the due process required by the Fourteenth Amendment and Article 1, section 12 of the Indiana Constitution. See Bd. of Curators of Univ. of Mo. v. Horowitz, 435 U.S. 78, 84-85, 98 S. Ct. 948, 952 (1978) ("We need not decide, however, whether respondent's dismissal deprived her of a liberty interest in pursuing a medical career. Nor need we

decide whether respondent's dismissal infringed any other interest constitutionally protected against deprivation without procedural due process. Assuming the existence of a liberty or property interest, respondent has been awarded at least as much due process as the Fourteenth Amendment requires. The school fully informed respondent of the faculty's dissatisfaction with her clinical progress and the danger that this posed to timely graduation and continued enrollment. The ultimate decision to dismiss respondent was careful and deliberate. These procedures were sufficient under the Due Process Clause of the Fourteenth Amendment."); Gagne, 692 N.E.2d at 495 (holding that Gagne's due process rights were not violated, finding that Gagne was aware he faced possible expulsion and that he had notice of the alleged misconduct, and rejecting Gagne's argument that his due process rights were violated by the dean's reliance on evidence gathered after the hearing in determining the appropriate sanction where the evidence supported a finding that the dean did not rely on the later-gathered evidence); Reilly, 666 N.E.2d at 445 (holding that, whether Reilly's dismissal is characterized as academic or disciplinary, none of the alleged deficiencies raised by Reilly amounted to a denial of due process and that Reilly was fully apprised of the evidence against her, that she had an opportunity to present her side of the story prior to the committee's decision, and that the procedures used afforded Reilly at least the minimum due process required by the Fourteenth Amendment and Article 1, section 12 of the Indiana Constitution). Accordingly, the trial court did not err in entering summary judgment in favor of the University on this basis.

A.      Arguments of the Parties

Amaya next maintains that his dismissal from the University is not supported by substantial evidence.  He argues in part that he presented evidence that it is quite possible that the coincidence that was observed happened entirely by chance, that "in a class of more than one hundred forty (140) students, it would not be unusual to find several students who have at least seven of the same incorrect answers as another student who answered fourteen incorrectly," and that there is "no 'exact match' of wrong answers in any part of Amaya's exam with that of his neighbor," that "the probability of Amaya's and his neighbor having selected the same wrong answers only by chance is one in 20 (0.048) to one in 30 (0.033)," and that "Amaya's behavior was not easily recognizable." Appellant's Brief at 24-25.  He contends that the University's decision to dismiss him was arbitrary and capricious and that the court erred in determining there was the requisite amount of evidence necessary to support the SPC's decision.

The University maintains that Amaya's position regarding the evidence is in reality a substantive due process allegation that asserts the school made an improper determination on the merits.  It argues that the testimony of the three eyewitnesses is much more than "some" evidence, and that the "some evidence" standard requires less than a preponderance of the evidence.  The University says that this court in Reilly did not mandate an exact level of statistical correlation to support a determination of cheating, that Amaya's unusual behavior during the exam convinced three experienced

professors that he had indeed cheated, and that there was some evidence, and compelling and substantial evidence, to support this conclusion.

In his reply brief, Amaya contends that the court in Reilly established that, to constitute "some evidence" of cheating, eyewitness observations must be combined with statistical evidence. He argues that the need for statistical correlation is based on the premise that human observations are notoriously fallible, and that "[o]ut of 140 students, 5% will have answers exactly the same as Amaya entirely by chance." Appellant's Reply Brief at 13.

B.    Substantial Evidence Analysis

Due process requires that a university base an expulsion of a student on substantial evidence. Gagne, 692 N.E.2d at 493. "Although due process requires schools and colleges to base their suspension and dismissal decisions on substantial evidence, the standard of review on appeal is whether there is some evidence to support the decision of the school or college disciplinary board." Reilly, 666 N.E.2d at 446. In Reilly, the court held in part that "[t]he professors' observations of cheating behavior by Reilly combined with the statistical analysis of the test results constitute[d] at least some evidence in support of the Committee's conclusion that Reilly cheated on her final exam." Id.

The University's designation of evidence includes an affidavit of Dr. Brokaw, the court's order which denied in part its motion to dismiss Counts I and II of Amaya's second amended complaint, and the second amended complaint. Amaya attached twenty-one exhibits to his second amended complaint, which included, among other documents, the written statements of Dr. DiMicco, Dr. Prag, and Dr. Hilgarth, the written responses

of the proctors to written questions, a letter and report prepared by Christopher Holloman, Ph.D., assessing the accusation of academic misconduct against Amaya, and a report prepared by Luis Casian, Ph.D.

In a written statement dated April 15, 2010, Dr. DiMicco said that the mini-block exam on March 29, 2010 consisted of three exams, "Pharm, ICM, and Pathology," that it was "very clear to me that Mr. Amaya was looking at the work space of the student to his right, and doing so in such a way as to conceal this behavior – i.e., by looking downward and then shifting his gaze to the right," that "[i]n spite of the fact that each student had three exams with multiple pages to work on, most of the time I could see that Mr. Amaya and the student to his right were on the same page of the same exam," and that "[a]fter the student next to Mr. Amaya finished and left, the behavior described above ceased." Appellant's Appendix at 122. Dr. DiMicco's statement further said that Dr. Hilgarth had found that, on the ICM exam, Amaya "missed all five questions that the other student missed – and for all five Mr. Amaya had the same wrong answers" and that, on the pathology exam, "[t]he other student missed two questions, and again Mr. Amaya missed the same two questions with the same incorrect responses." Id. at 122-123. In a written statement dated April 15, 2010, Dr. Prag said that she saw Amaya "tip his head forward and shift his eyes to the right to look at the other student's paper," that "[i]t was very easy to see where he was looking," that "[h]e repeated this behavior many times during the 90 minutes while I was there," and that "it was clear that his behavior was dishonest and not in keeping with the honor code at this institution." Id. at 124. In a written statement dated April 16, 2010, Dr. Hilgarth said that he observed Amaya "looking downward and

22

then looking to the right," that "[i]t appeared that he was looking at the exam of the student to the right of him," that "[t]his behavior occurred repeatedly during the exam," and that "this behavior ceased when the student who was sitting to the right of him left and turned in his exam." Id. at 125. Dr. Hilgarth also stated that "[e]very time I looked down, I observed that Mr. Amaya and the student to his right were on the same page of their exam" and that Amaya "missed the same 5 questions and had the same wrong answers as the student to the right of him." Id. Further, the members of the SPC submitted written questions to Dr. Hilgarth, Dr. DiMicco, and Dr. Prag, and the three professors provided written responses. When asked if they were sufficiently confident that Amaya cheated for the SPC to take action, Dr. Hilgarth responded affirmatively, Dr. DiMicco stated that he had "no doubt that [Amaya] was cheating," and Dr. Prag stated "I am confident that Mr. Amaya cheated by peering at his neighbor's student's test. I personally observed him casing sidelong glances in his neighbor's direction several times." Id. at 135-136.

In a report dated May 5, 2010, Dr. Holloman stated that he performed a statistical analysis related to the five questions that Amaya and the student to his right answered incorrectly and for which they provided the same incorrect answers and found that "if Mr. Amaya truly is innocent there is almost a 1 in 20 chance that he would have answered these five questions exactly the same way as his neighbor simply by chance." Id. at 163. In a letter dated May 8, 2010, Dr. Casian said that the exam consisted of ninety-one multiple choice questions, that "(I) [the student to the right of Amaya] had at least 7 incorrect responses among the 14 questions that Mr. Amaya answered

23

incorrectly," and that "(II) [f]or seven of the incorrect responses in common . . . the responses of [the neighboring student] were exactly the same." Id. at 164. Dr. Casian's letter further stated "the chances that (I) and (II) occurring at the same time can be estimated . . . . This gives . . . about *one in one* [sic] *thirty (or one in fifty)*. With more than 140 students taking the exam it is not unusual to find several students with the configuration (I) and (II) in the group that took the test." Id. at 167.

While the evidence presented by Amaya suggests that the probability that Amaya selected the same wrong answer as his neighbor in this case by chance is much higher than the probability the student did so under the circumstances in Reilly,[4] we cannot conclude that the relative likelihood of Amaya selecting some of the same wrong answers as his neighbor cannot constitute evidence which may be considered and which tends to support the conclusion of the SPC and Dean Brater that Amaya committed the alleged misconduct. Similarly, the fact that there may not have been an exact match of all of the wrong answers between the exam sheets of Amaya and his neighbor does not necessarily require a finding that Amaya did not commit the alleged misconduct. As set forth above and in the designated evidence, the three professors who proctored the mini-block exam and observed Amaya set forth their observations in detail in separate written statements, and Amaya presented statistical and other evidence to support his explanation that the professors' observations and their inferences based on their observations were incorrect. The statements of the professors who observed Amaya and the analysis and other evidence presented by Amaya were carefully considered by the members of the SPC.

---

[4] In Reilly, a statistician advised that there was "a one in 200,000 probability that such a match of wrong answers on the multiple choice questions would occur by chance." 666 N.E.2d at 442.

24

The designated evidence shows that there was at least some evidence in support of the decision of the SPC and Dean Brater that Amaya cheated on the mini-block exam, and we cannot conclude that the decision to dismiss Amaya from IUSM was not based upon substantial evidence or was arbitrary or capricious. See Reilly, 666 N.E.2d at 446 (holding that "[t]he professors' observations of cheating behavior by Reilly combined with the statistical analysis of the test results constitutes at least some evidence in support of the Committee's conclusion that Reilly cheated on her final exam" and that "[b]ecause the Committee's determination is supported by the evidence, we cannot conclude that the decision to expel Reilly was arbitrary or capricious"). Accordingly, the trial court did not err in entering summary judgment in favor of the University on this basis.

## CONCLUSION

Based upon the summary judgment materials and designated evidence, we conclude that Amaya has not met his burden to establish that the trial court erred in finding there was no genuine issue of material fact as to Counts I and II of Amaya's second amended verified complaint and in granting the University's second motion for summary judgment as to those claims.

For the foregoing reasons, we affirm the trial court's summary judgment in favor of the University.

Affirmed.

RILEY, J., and BRADFORD, J., concur.

25